[Civ. No. 2832. Fourth Dist. Dec. 19, 1941.]

Estate of ALLAN BRADFORD MONKS, Deceased. IDA
NANCY LEE et al., Respondents, v. ANTOINETTE
GIRAUDO, Appellant.

John Coker, George A. Mallette, Lewis R. Kirby, Herbert S. Avery and Walter E. Doherty, Jr., for Appellant.

Gray, Cary, Ames & Driscoll, Burton D. Wood, Thomas Whelan, District Attorney, and R. E. Jenson, Deputy District Attorney, for Respondents.

WEST, J. pro tem.—This is an appeal from a judgment of the Superior Court of San Diego County denying probate to a will of Allan Bradford Monks, deceased, dated August 4, 1928, and admitting to probate an earlier will of said deceased dated September 22, 1913.

The issues, insofar as presented here, arise by virtue of the trial court's determination first, that Monks in 1913 exe-

cuted in the State of Massachusetts a valid testamentary document leaving all of his property to Ida Nancy Lee; second, that the will dated August 4, 1928, in which appellant was bequeathed the entire estate, was procured by fraud exercised by the appellant; third, that said later will was procured by reason of undue influence exercised by the appellant; and fourth, that the marriage of Monks and appellant on December 19, 1930, was void as in violation of miscegenation laws of the state of Arizona, and was therefore inoperative to revoke the 1913 will.

Respondent Ida Nancy Lee filed a petition for probate of the 1913 will. Appellant instituted a contest and also petitioned for probate of the 1928 will. Mrs. Lee contested the latter petition. Louisa D. Hemple, an aunt of Monks, and who alleged that she was his sole heir at law, filed her opposition to each of said wills. Mrs. Hempel died before the trial and Chester D. Gunn, as special administrator of her estate, was substituted. He did not appeal from the judgment and appears here only as a respondent by virtue of his successful attack on the 1928 will.

The record is very voluminous and presents a rather complete life history of the deceased and of the beneficiaries of his wills as bearing on his two testamentary declarations of 1913 and 1928 respectively, and his subsequent purported marriage to appellant in December, 1930.

Allan Bradford Monks was born in 1875. His grandfather, John P. Monks had, during his lifetime, created a trust from which certain income had been paid to Monks, and in the principal of which he would share upon the death of the last surviving child of his grandfather. Monks had a boyhood friend, one Charles Tennant Lee, whose wife, Ida Nancy Lee, is one of the respondents. Monks made his home with the Lees at intervals totaling a considerable portion of the time from 1907 to 1925, and during a large portion of this period was engaged in business enterprises with Lee. On September 22, 1913, the date of the first will, the relationship just alluded to existed. This will was attested by three witnesses, two of whom testified at the trial, the other having died prior thereto. This will will be hereafter again referred to. In 1925, Monks and one Hanford engaged as partners in the city of San Diego in a motorcycle sales business, Monks making his home with the Hanford family.

Some time in the year 1927, the exact time being the subject of dispute, Monks and the appellant Antoinette Giraudo became acquainted. It appears that the acquaintanceship was at first casual and that the entire Hanford household, including Monks, participated in visits which were of a friendly nature only, although at the trial the appellant gave much testimony to the effect that she loaned Monks large sums of money during 1927 and 1928, and that she and the deceased were engaged to be married as early as October, 1927. In February, 1928, Monks and his partner Hanford were injured in a motorcycle accident. Monks was disabled for a period of time variously said to be from ten days to several weeks in duration. Hanford returned to work very soon after the accident but died about two months later, and thereafter Monks continued the operation of the business. As to his conduct and activities following the accident there was hopeless conflict in the evidence. Much testimony was adduced by respondents indicating a distinct personality change on the part of the deceased beginning soon after the injury and progressively continuing. In May, 1928, he had an argument with the Lees and ordered them from his store. Several witnesses stated that he became unkempt in his personal habits, whereas before his injury he had been immaculate and neat. He was seen on the streets during the daytime clad only in pajamas and robe. There was testimony that he became jumpy and would sit for long periods of time and stare into space, and that he apparently did not realize when he was being spoken to by persons who had occasion to converse with him. During a few months after his accident he wrote fervent love letters to appellant, whereas, his conduct prior to his injury, insofar as women were concerned, was generally one of lack of interest. Mrs. Hanford, in whose home he lived for several years before and for several months after the accident, stated that he became nervous and restless and was unable to sleep at night; that he complained of pain in his head; that she observed appellant giving tablets to him which appeared to induce a condition of stupor. One Todd, a police officer, testified that he had known Monks since 1914; that after the accident he noticed a distinct change; that Monks did not recognize him; and that upon attempted conversations his statements were irrational.

In July, 1928, Monks suddenly and without previous notice

left the Hanford home and took quarters next door to appel-\
lant's residence. There was evidence to the effect that there-
after Mrs. Hanford asked for a statement of the affairs of
the motorcycle business in which she had an interest by reason
of her husband's death, and that Monks stated that appellant
had given orders that she, Mrs. Hanford, could not see the
books outside of the presence of appellant and that in an
ensuing argument Monks slapped her.

Several persons testified as to the activities of appellant as
relating to Monks' conduct and actions following his injury.
A. L. Hubbell, attorney, testified that in the spring of 1928,
appellant stated to him that Monks had lots of money and
that appellant was going to get him away from the Hanford
home. Credence is lent to this testimony by reference to a
letter written by Monks in May of 1928 to the appellant, a
portion of which reads as follows:

"I don't know what the Hanfords are going to do— . . .
I ask no question—make no comments—and am pleasant to
them—remembering what you said about not promising to
stay with them . . . I am depending on you for help and
advice when the time to move comes."

It appears that appellant was active in securing or at-
tempting to secure from Monks a transfer of his interest in
the motorcycle agency to herself. Hubbell testified that ap-
pellant asked him to take her to the motorcycle shop and
upon arriving there stated to him: "Mr. Monks wants you
to make a bill of sale to me of all his interest in this motor-
cycle shop." Another witness who had been financing the
sales of motorcycles for the agency testified that Monks ad-
vised him that he had transferred the business; that he got
no consideration therefor; and that he had had to do so to
avoid trouble. As to the relationship generally, Mr. Hubbell
testified:

"At first Mr. Monks was madly infatuated with Miss
Giraudo. It appeared to me from his actions like a man
that was hypnotized. He did everything she told him. He
always signed every paper that she asked him to sign. She
would insult him and abuse him publicly many times and he
never talked back, never said a word, never resented anything
she said to him, and that was the condition all the time."

A considerable amount of testimony was produced bearing
upon appellant's race, nationality and background. The ap-

pellant stated that she had told Monks that she was French, and one witness at least testified that she heard appellant tell Monks that she was a French countess and that she exhibited papers of some kind which purported to contain proof thereof. C. Tennant Lee testified that he suggested to deceased in April of 1928 that appellant had Negro blood. His testimony regarding Monks' reaction to this follows:

"Q. What was his reply to you? A. 'Oh, no,' he said, 'she is the daughter of a French consul and married to a Frenchman in New York, who had a seat on the stock exchange, and is the cantaloupe queen,' and so forth and so on.''

On August 4, 1928, Monks executed a will which will hereinafter be referred to as the Giraudo will, leaving all of his property to the appellant. There was some conflict in the testimony as to whether or not appellant was present at the time that this will was executed. She contended that she had not seen Monks for several weeks before this date and that she did not see him for some time afterward. It appears, however, that at this time Monks was living next door to her house and that she was in San Diego both immediately before and immediately after the date of the will. It further appears that two of the subscribing witnesses to the will were persons who were living in her house at the time the will was executed.

On August 15, 1928, 11 days after the execution of the Giraudo will, Monks executed a number of promissory notes, the face amount of which totaled $30,000. These notes all named appellant as payee and were secured by a chattel mortgage by which the deceased hypothecated his interest in the trust estate of his grandfather. Some time during the month of December, 1928, the deceased moved from the house in which he had been living since July and thereafter resided in the home of appellant until the marriage of Monks and appellant which took place at Yuma, Arizona, on December 19, 1930. Following the marriage and during portions of 1931 and 1932, it appears that Monks lived at various times in Pacific Beach, Oceanside, and Long Beach, and that while residing in these places his constant companion was a Japanese who had for years been an employee of the appellant. The record fairly discloses that at least while at Oceanside and Long Beach he was almost devoid of understanding.

Monks was taken into custody in Long Beach in July, 1932, at which time his condition was portrayed as one of almost complete lack of mentality. He was subsequently committed to the Norwalk State Hospital, where he remained in a hopelessly insane condition until his death in 1937.

Little of the foregoing statement was the subject of agreement. Appellant denied any knowledge of the bill of sale. She stated that she did not at any time see such a document. She denied that she had exercised any influence over Monks but on the contrary contended that Monks was at all times desirous of immediate marriage and wished to get entirely away from his previous associations. She denied that there was any Negro blood in her veins, and testified that she was of pure French descent. She contended that she had, prior to the execution of the promissory notes and chattel mortgage, loaned to Monks and otherwise secured for him sums of money far in excess of the $30,000 represented by the notes, though the record indicates that she was in financial straits during the period when the alleged advances were made. She contended, and offered a number of witnesses in support of her contention, that there was no evident change in the mental capacity or personality of Monks up until long after the marriage of December 19, 1930.

The foregoing is but a brief summary of the large amount of evidence offered on all of the phases of Monks' career between his meeting with appellant and his death. It offers some indication of the nature of the testimony presented to the trial court.

The consideration of the points in issue will be in inverse order to the statement of them as set forth above, and some amplification of the facts will be necessary. The appellant vigorously assails the finding of the trial court that she was of Negro descent, but contends that even if such finding is supported by credible evidence, nevertheless the Arizona miscegenation statute is unconstitutional as imposing an absolute prohibition against marriage upon any person of mixed Negro and Caucasian blood. As to the first of these points little need be said. At the trial one Malcolm J. Rogers, an anthropologist, testified that in his opinion appellant "was at least one-eighth Negroid." Dr. James C. Anbers, a physician who had had much experience in the southern states and in Africa in his profession, gave as his opinion that

appellant had, as near as he could determine, one-eighth Negro blood. A Mrs. Pentecost, a beauty parlor operator, testified that appellant told her that the beauty parlor in which the witness was employed had been giving appellant beauty treatments after shop hours. This witness was questioned further as to the reason for this arrangement. A portion of this testimony follows:

"BY MR. WALTERS: Q. Did she tell you why? A. Because she had Negro blood in her. BY THE COURT: Q. What did she say about it? Is that what she said? A. Yes."

Another short quotation concerning the conversation between the witness and appellant follows:

"I told her it was too bad that the palms of her hands and her fingernails showed Negro blood in her; if it wasn't for that they could never tell she was Negro. Q. What did she say? A. She said yes."

Still another witness, a man who had been employed by the State Labor Commission, stated that appellant told him that she was a Louisiana Creole. In addition to the testimony just referred to the trial court had the opportunity to observe the appellant for many days during the trial and was entitled to draw conclusions from such observations.

It may be well here to briefly discuss one other contention raised in order to understand the constitutional question involved. Appellant urges that there was no evidence in the record to establish that Monks was a Caucasian or a descendant of a Caucasian. However, there was introduced into the record an affidavit executed by the deceased in connection with his application for a marriage license, which affidavit states that he was a member of the Caucasian race. Furthermore, the court had before it for observation photographs of Monks. ▆ Finally, the case was tried on the obvious theory that Monks was a Caucasian. Where the record demonstrates that an assumption has been entertained throughout the trial by the court and the parties as to the facts, an appellate tribunal will not decide an appeal on a contrary state of facts. (*Marra* v. *Aetna Construction Co.,* 15 Cal. (2d) 375 [101 Pac. (2d) 490].) ▆ In our opinion there was substantial evidence to support the finding of the trial court that appellant "is the descendant of a Negro in that it is true that the said Antoinette Giraudo

has one-eighth Negro blood and that she has seven-eighths Caucasian blood; that it is true that said decedent was a member of the Caucasian race and a person of Caucasian blood.''

Appellant predicates her chief attack, so far as the validity of the marriage is concerned, upon the Arizona statute defining miscegenetic marriages as it existed on December 19, 1930, the date of the ceremony in Yuma. So far as pertinent to this discussion, the code provision (Sec. 2166 of the Revised Code of Arizona, 1928) read as follows:

"The marriage of persons of Caucasian blood, or their descendants, with Negroes, Mongolians or Indians, and their descendants shall be null and void . . . "

It is contended that since the court found appellant to be seven-eighths Caucasian blood and one-eighth Negro blood she is of necessity a descendant of a Caucasian, and also a descendant of a Negro, and as such a person of mixed blood the statute prohibits her from contracting any valid marriage in Arizona. This condition she claims is repugnant to the Fourteenth Amendment to the Constitution of the United States in that it deprives her and others of her racial classification of liberty to contract marriage. Her assertion is interesting but in our opinion not tenable for the reason that appellant is limited in her attack on the statute to the factual situation presented. If she, as a person found to be a hybrid, were facing a contention that her marriage to another of the same mixed blood was invalid, then it is obvious that the constitutional problem would be squarely presented.. But she is not so situated. Her purported marriage was with a person found to be of unmixed Caucasian blood. This is the fair interpretation of the findings. Many states have statutes prohibiting such alliances, and we have had presented no instance of successful constitutional attacks upon them or any of them. It is true that the Arizona provision differs somewhat in form from the miscegenetic legislation of other states in that in lieu of the phrase "persons of Caucasian blood, or their descendants," most jurisdictions use the words "white," "white person," or "person not of African descent" as describing the one prohibited party, and thus avoid the mixed blood difficulty arising from a consideration of the status of one who traces ancestry to both Caucasian and Negro forebears.

Without, however, further considering the ramifications of the problem as it might appear under dissimilar facts to those presented here, we pass to the consideration of the statute as applicable to the relationship sought to be created by the ceremony of December 19, 1930. It was, for our purposes, an attempted marriage between a Caucasian man and a woman whose status must be treated as that of a descendant of a Negro. Such descendant, under the Arizona statute, is subject to the same restriction with respect to contracting marriage with a Caucasian as would be her Negro ancestor. This cannot be gainsaid under any logical construction of the code provision. Therefore the attack upon the validity of the statute is identical in effect with that made in the Arizona case of *Kirby* v. *Kirby*, 24 Ariz. 9 [206 Pac. 405]. In that case, which appears to be the only one in which the miscegenation law of the state has been construed, there was involved the validity of a purported marriage between a white man and a Negro woman. The former instituted an annulment action on the ground that the marriage was void because contracted in violation of the statute hereinbefore quoted. The defendant demurred to the complaint, attacking the statute as in violation of the Federal Constitution in that it was susceptible of the interpretation that a person of mixed blood of which Caucasian blood was a part, could not contract a lawful marriage in Arizona. The demurrer was overruled and a decree was entered annulling the marriage. Upon appeal the Supreme Court of Arizona affirmed the judgment and denied the attack on the validity of the statute upon the facts presented. A portion of the opinion is as follows:

"The defendant's objections to the validity of the law, to wit, that under it persons of mixed Caucasian blood cannot marry any person or lawfully contract any marriage in this state, if true, is an attack thereon which she is not entitled to make for the reason that there is no evidence that she is other than of the black race. In other words, it is not shown that defendant is a descendant of the Caucasian race. It will be time enough to pass on the question she raises by her demurrer when it is presented by some one whose rights are involved or affected. As was said by this court in *Gherna* v. *State,* 16 Ariz. 344 [146 Pac. 494, Ann. Cas. 1916D, 94]:

" 'We believe it to be the unquestioned rule that a person cannot raise a constitutional objection to a part of a statute which is not applicable to his own particular case. The authorities are overwhelmingly to this effect.' "

We believe the foregoing quotation is applicable to the situation presented here because while it is true that there was evidence that appellant is a descendant of the Caucasian race, as well as of the Negro race, the other contracting party was of unmixed blood and therefore the hypothetical situation involving an attempted alliance between two persons of mixed blood is no more present in the instant case than in the Kirby case. ▇ It is interesting that the Supreme Court of Arizona appears to recognize the possibility of a circumstance arising in which persons of mixed blood might have occasion to test the validity of the Arizona law, but it also must be said that Arizona appears to follow what is the established rule in California and is the purport also of Federal Court declaration, *viz.*, that any person attacking the constitutionality of a statute is limited to the factual situation raised by the issues, and that the record must disclose the present necessity for the decision. In *People* v. *Globe Grain & Milling Co.*, 211 Cal. 121 [294 Pac. 3], the Supreme Court said:

"It is well established that a charge of unconstitutional discrimination can only be raised in a case where this issue is involved in the determination of the action, and then only by the person or a member of the class of persons discriminated against." (See also *Pacific Indemnity Co.* v. *Myers*, 211 Cal. 635 [296 Pac. 1084]; *Fox-Woodsum Lumber Co.* v. *Bank of America*, 7 Cal. (2d) 14 [59 Pac. (2d) 1019]; *Platt* v. *Philbrick*, 8 Cal. App. (2d) 27 [47 Pac. (2d) 302]; *Tennessee Publishing Co.* v. *American National Bank*, 299 U. S. 18 [57 Sup. Ct. 85, 81 L. Ed. 13]; *Schauer* v. *Producers Wool & Mohair Co.*, 86 Fed. (2d) 576.)

One of the clearest declarations of the principle that only the factual situation presented will be contemplated in passing on the validity of legislation is found in *Max Factor & Co. et al.*, v. *Kunsman*, 5 Cal. (2d) 446 [55 Pac. (2d) 177], where at page 468 it was said:

"Respondent presents several hypothetical situations under which enforcement of the act would be inequitable or difficult, or, perhaps, even unconstitutional. It is elemen-

tary, of course, that a statute may be invalid as applied to one set of facts, yet valid as applied to another. (*Dahnke-Walker Milling Co.* v. *Bondurant*, 257 U. S. 282 [42 Sup. Ct. 106, 66 L. Ed. 239].) The situations conjured up by respondent are not here involved, and respondent is limited in his attack to the application of the statute to the factual situation now before the court.''

It is fundamental that it is the duty of the courts to view a statute in the light of every intendment favoring constitutionality (*Southern Pacific Ry. Co.* v. *Stibbens*, 103 Cal. App. 664 [285 Pac. 374]), and its unconstitutionality must appear clearly to justify its being declared invalid. (*People* v. *Waller*, 64 Cal. App. 390 [222 Pac. 171].) There is no greater reason certainly, and in fact less, to relax the foregoing rules where the statute of another state is under scrutiny. (See *In re Boswell*, 96 Fed. (2d) 239.)

We feel that no further discussion need be indulged in on the constitutional question raised. Under the facts presented the appellant does not have the benefit of assailing the validity of the statute.

Another point incidentally arises by reason of appellant's ingenious argument that even though it should be determined that the Arizona statute is valid, it should not be so construed as to bar a marriage between Monks, who was found to be a person of Caucasian descent, and herself, also so descended, even though she be likewise a descendant from other blood. The prohibition of the statute, so far as applicable here, is as to marriage between a Caucasian and the descendant of a Negro. It is the presence of one-eighth Negro blood and not the presence of seven-eighths Caucasian blood which raises the bar, so far as appellant's marriage to a Caucasian is concerned.

Appellant asserts that the ceremonial marriage is supported by the presumption of validity and that the burden of proof is cast upon those attacking it. She cites *Estate of Chandler*, 113 Cal. App. 630 [299 Pac. 110], which supports her contention. The presumption raised, however strong it may be, is rebuttable, and while it may be that it is not dispelled by a mere conflict in the evidence as to the fact to which it is opposed (*Ohran* v. *County of Yolo*, 40 Cal. App. (2d) 298 [104 Pac. (2d) 700]), yet it cannot

be that the court is required to follow the presumption when the evidence overcomes it by proof that the elements upon which the presumption rests were not present, or more properly stated, when the facts are such as to make the presumption bow to the express statutory prohibition against the relationship sought to be maintained through the medium of the presumption.

The court predicated its refusal to admit the so-called Giraudo will of August 4, 1928, to probate on two grounds, namely, fraud and undue influence. The fraud alleged and found consisted of false and fraudulent representations by appellant to decedent that appellant was a member of the Caucasian race, of pure French descent and ancestry; that she was not a descendant of a member of the Negro race; that such representations were false, fraudulent and untrue, and that they were known by the appellant at the time they were made to be false, fraudulent and untrue. It was further found that in reliance upon the representations so made, decedent became affianced to appellant prior to August 4, 1928, in the belief that a valid marriage could and would be consummated, and that in further reliance upon the representations the will was executed. It cannot be doubted that appellant did represent to decedent that she was of pure French descent. She gave the following testimony: ''Q. You told him you were pure French? A. That is what I told him.'' Other evidence respecting her representation to Monks as to her nationality has hereinbefore been alluded to as has evidence regarding decedent's belief that appellant was French.

■ Generally, the question of whether or not false and fraudulent representations so affected the mind of a testator as to bear upon his testamentary disposition is one of fact. As was said in *Estate of Newhall*, 190 Cal. 709 [214 Pac. 231, 28 A. L. R. 778]:

''If, from the evidence offered in support of contestant's case, the inference can fairly be drawn that the intent behind the making of the false representations was to influence the execution of the will, and that the will was a result of such false representations, and but for such representations would not have been so drafted, then the *prima facie* case necessary to take the case to the jury has been established. From the very nature of the inquiry the proof must necessarily be

largely or wholly circumstantial. The contestant is not required to prove every fact and every conclusion of fact upon which the issue depends. Legitimate and reasonable inferences may be drawn from every fact proved and any inference fairly deducible from the evidence is as much proved for the purpose of making out a *prima facie* case as if it had been directly proved. The contestant is not confined to the bare facts but is entitled to the benefit of all inferences which may legitimately be drawn from the facts established.''

In *Estate of Carson,* 184 Cal. 437 [194 Pac. 5, 17 A. L. R. 239], an appeal was taken by the contestants of a will from a judgment of nonsuit. The judgment was reversed. It appeared that there was no direct evidence that the inducing reason for the bequest to the fraudulent person contained in the decedent's will was the belief of the testatrix in the truth of the status represented to her, nor was there direct proof that the bequest would not have been made except for the belief, yet it was stated by the Supreme Court that such direct proof is unnecessary if the inference could reasonably be drawn from the facts that the belief in the truth of the representations was the inducing reason for the bequest. The court had before it substantial evidence in drawing the inference of fraudulent procurement of the will.

Undue influence of appellant in bringing about and effecting the execution of the testamentary document of August 4, 1928, was found. While some question arises as to whether appellant in her pleadings denied the charge in this respect, we do not think it necessary to determine the matter upon such technical contentions.

The general nature of the relationship between the testator and his beneficiary has been set forth in the statement of facts. To summarize, we must say that the avowed intention of appellant to get Monks away from his friend and business associate, Mrs. Hanford, coupled with her significant remark that he had lots of money; her success in causing the removal of Monks from the Hanford home just a short time before the will was executed and into her own home a few months later; the attestation of the will by two residents of appellant's household; the activity of appellant in connection with the bill of sale involving Monks' interest in the motorcycle business; her securing of a purported lien

on decedent's share in the Monks trust within a few days after the will was executed; her influence on Monks characterized by one witness with the words: "He did everything she told him"; his bondage with respect to his affairs which even caused him to refuse an examination of the books of his business to a person financially interested, without the consent of appellant; his personality change within the few months next preceding the will, including negligence in dress; extreme nervousness; preoccupation to the degree that he did not reply to questions and stared unseeing for long periods; his repudiation of old and valued friends;—all these supply evidence that the will was, to use the language of the Supreme Court in *Estate of Caspar,* 172 Cal. 147 [155 Pac. 631], "the product of a mind upon which undue influence was exercised in the very matter of the testamentary act. ..." ▮ It is, of course, true that the undue influence, in order to be sufficient to deny probate to the will, must have been exerted either at the time of or prior to the execution of the testamentary document, and its effect must be discernible in the very act either by circumstances or by direct proof, but the general nature of the relationship existing both before and after the execution of the will in the instant case tends to support the conclusion that decedent was dominated by the will of appellant. ▮ Under the circumstances here presented we may take judicial notice of the matters contained in the records of this court on an appeal in the case of *People* v. *Monks,* 133 Cal. App. 440 [24 Pac. (2d) 508], which record, while referring to matters occurring after the execution of the will before us, nevertheless is illuminating as to the long continued domination by appellant over the affairs of the decedent. That such judicial notice may be taken, we refer to *Hammell* v. *Britton,* 19 Cal. (2d) 72 [119 Pac. (2d) 333].

It is true that appellant offered much testimony which she contends indicated a desire of deceased to cut the old ties of friendship; which evidenced a great affection for appellant as the only person who had afforded him the society which he craved from the other sex, and which indicated that appellant's advice and help was of great concern to him. Conceding this conflict, we are impelled to say that there was substantial evidence that the will was procured by fraud exercised by appellant and also that there was sub-

stantial support for the finding that it was the product of undue influence over decedent's testamentary act, and therefore the judgment denying probate to the Giraudo will must be held to be justified on either of said grounds, if not on both.

The other question involved is as to the propriety of the court's judgment or order admitting to probate the Lee will of September 22, 1913. The court found that Monks was competent in every respect at the time of the execution of said will; that he signed it in the presence of three attesting witnesses who were all present at the same time; that he declared to the witnesses and each of them that the document so signed and attested was his will; and that the witnesses signed in his presence and in the presence of each other at his request; that there was no fraud, duress, menace or undue influence; and that said will was unrevoked. It appeared at the trial that one of the witnesses to the will had died. The lawyer who drew the will testified, as did the other two witnesses, at an earlier partial hearing of the proceeding which terminated because of the death of the trial judge. The transcript of the evidence of the attorney and the two witnesses was read into the record here and presents the same sharp conflict which characterized the testimony offered throughout the trial. John T. Finn, the lawyer, stated that Monks came to him on September 22, 1913, and asked him to prepare the will, which was done immediately in Finn's office in the town hall at Dedham, Massachusetts; that the three attesting witnesses were city employees who were found in the building and who came in at the request of Finn to complete the execution. He further testified that he introduced the witnesses to Monks, asked him if it was his last will, and upon receiving his affirmative answer, had him sign and the witnesses attest his signature, and that Monks was present at all times. On the contrary, one of the surviving witnesses, one Webb, gave evidence that Finn asked him to sign a paper which he did in the presence of the other witnesses but not in the presence of Monks; that he did not know Monks, and so far as he knew, he had never seen him, and that the paper he signed was not identified to him as a will. The other witness, Farrington, gave similar testimony, excepting, however, he admitted that the document executed by the three witnesses

was identified as a will. To further complicate the factual situation thus presented, there was expert testimony produced by appellant that the purported signature of Monks to the will was a forgery, and just as positive was the testimony of another such expert called by respondents that it was the genuine signature of the decedent. In addition, there was considerable stress laid on the unnatural character of the will in that the respondent Ida Nancy Lee was unrelated to decedent and that decedent had relatives living at the time the will was made who were the natural objects of his bounty.

As already stated, the trial court found for the proponent of the Lee will and the judgment necessarily must rely almost entirely upon the presumption of due execution as supported by the testimony of Finn, to overcome the declarations of the attesting witnesses negativing validity. There was some indication on the part of one of the subscribing witnesses, the witness Webb, of some haziness of memory, which was not surprising in view of the passage of nearly 26 years between the date of the will and the testimony of the witness. It also appeared that both witnesses were, while in San Diego, living in homes visited by the appellant. Suffice it to say that the 1913 will was presented to the trial court, vouched for as to due execution by a regular and complete attestation clause, supported by the testimony of the attorney who drew it as to due execution, and bearing a signature both identified as that of the decedent and denied to be his genuine signature.

The situation here is comparable to that found in *Estate of Pitcairn*, 6 Cal. (2d) 730 [59 Pac. (2d) 90], although there the formal attestation clause was lacking. However, the language used is enlightening as a statement of the rule to be applied here. It was said in that case:

"The rule is well established that a regular and complete attestation clause makes out a *prima facie* case of due execution of the will. The authorities have clearly recognized that where witnesses are dead, unavailable or unable to testify or recollect, or are adverse or corrupt, it is necessary to rely upon other evidence of the sufficiency of the instrument, and accordingly have applied the above-mentioned presumption. (See, generally, *Hawkinson* v. *Oatway*, 143 Wis. 136 [126 N. W. 683, 139 Am. St. Rep. 1091]; *In re Sullivan's Estate*,

114 Mich. 189 [72 N. W. 135]; Rood on Wills, 2d ed., sec. 798a, p. 822; note, 76 A. L. R. 617.)''

Again quoting from the same decision:

''They contend that even if the presumption is applicable to those situations, the presence of subscribing witnesses who give adverse testimony destroys the presumption. But in our opinion, if the presumption be recognized, it is seldom material to an appellate court whether the subscribing witnesses were unavailable, unable to remember, or gave affirmative testimony adverse to the will. A presumption is recognized in this state to be independent evidence which may be weighed against positive testimony, and in a proper case the lower court may follow the presumption of due execution from proof of genuineness of the signatures, though the witnesses attack the will.''

It is our opinion that in reliance on the presumption of due execution as bolstered by Finn's testimony, the court's admission of the will to probate was not erroneous.

 Appellant has challenged the right of respondent Lee to contest the Giraudo will. In view of what has heretofore been said, no question remains but that respondent was a ''person interested'' within the contemplation of section 370 of the Probate Code.

The court had before it a petition for family allowance filed by the appellant. The petition was denied in view of the court's finding that no valid marriage had ever been entered into. No appeal was taken from this order and the same is final and is mentioned only because of reference made thereto in the briefs.

The judgment appealed from is affirmed.

Barnard, P. J., and Marks, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 16, 1942.