[S. F. No. 17734. In Bank. Dec. 28, 1949.]

Estate of VIRGINIA ESTELLINE DOPKINS, Deceased.
MAYE MacKECHNIE et al., Appellants, v. LYLE B.
OLIVER, Respondent.

Joe E. Greene and H. A. Savage for Appellants.

Rae B. Carter, L. M. Linneman and Linneman & Burgess for Respondent.

SCHAUER, J.—Contestants in this will contest appeal from a judgment entered on a verdict in favor of proponent. For the reasons which hereinafter appear, we have concluded that the judgment should be affirmed. ■ Contestants also attempt to appeal from an order denying their motion for a new trial; such order is not appealable (see Prob. Code, § 1240; *Estate of Anderson* (1938), 29 Cal.App.2d 637, 641 [85 P.2d 212]; *Estate of Frazer* (1941), 43 Cal.App.2d 324, 327-328 [110 P.2d 702]; *McNamara* v. *Emmons* (1939), 36 Cal.App.2d 199, 208 [97 P.2d 503]) and the attempted appeal therefrom will be dismissed.

The decedent, Mrs. Virginia Estelline Dopkins, died on December 23, 1946, leaving a will executed some five months earlier in which the proponent herein, Lyle B. Oliver, is named

executor and sole beneficiary. Mrs. Dopkins was a widow, left an estate of about $40,000 and no issue, and was over 90 years of age at her death. Contestants are divided into two groups: the first group are collateral relatives of Mrs. Dopkins' husband, who died in 1932; the second group are alleged to be collateral relatives, in the fifth degree, of Mrs. Dopkins herself.

Opposition to probate of the will was based upon the grounds, first, that decedent was not of sound mind when she executed the will, and, second, that the will was procured by the undue influence of proponent, Lyle B. Oliver. The jury found in favor of proponent on each issue.

The appeal is presented on a clerk's transcript, and a settled statement (Rules on Appeal, rule 7(a) and (d)) which includes certain of the instructions which were given and others which were refused. In addition, upon application of the contestants to the District Court of Appeal, while this matter was pending before that court, the record was augmented by a reporter's transcript of the testimony of Lyle B. Oliver at the trial herein and of all the instructions given by the court (Rules on Appeal, rule 12(a)).

As grounds requiring reversal of the judgment, contestants urge that the trial court erred in the refusing and the giving of various instructions, in making a certain comment in the presence of the jury when sustaining proponent's objection to a question propounded by counsel for contestants, and in the admission of certain evidence over contestants' objections.

From the record before us, it appears that Mrs. Dopkins and the proponent, a resident of Reedley, Fresno County, who was born in 1902, had been neighbors and friends since his childhood. In 1945, Mrs. Dopkins moved from her ranch home about three and one-half miles south of Reedley, to a home which she purchased in Reedley. Thereafter proponent under her direction and supervision assisted her in such matters as buying groceries, depositing her bank checks, and paying her bills. Purchases made for her were paid for with her money. Early in July, 1946, Mrs. Dopkins became ill and on the 13th day of that month she was taken to the hospital in Reedley, where she remained for over two weeks. Proponent testified that theretofore she had been "pretty feeble physically; she could not go to town or look after her physical needs alone"; that during her first three or four days in the hospital he remained with her continuously, leaving "only to eat"; that "I was there all night, I could not get a night nurse, and I

figured that [it] would be better if I stayed there because the other nurses were so terribly overburdened that they could not come in and see her often enough, so [at the request of the head nurse] I stayed there''; that "during a portion of that time she was somewhat delirious.''

On July 24 or 25, while Mrs. Dopkins was at the hospital, she requested proponent to "get a good lawyer and be sure you don't get Joe Greene [one of counsel for contestants herein]'' for the purpose of drawing a will for her. Proponent testified that he "told her that I had been told that Mr. [Rae B.] Carter was a good attorney,'' that he had not previously known Mr. Carter. According to the settled statement Mrs. Dopkins thereupon instructed proponent to interview Mr. Carter at the latter's office in Fresno and direct him "to draw a will for her, appointing Oliver executor thereof, and leaving her entire estate to him; [and] . . . direct Mr. Carter to take such proceedings as might be required in order to have Oliver appointed the guardian of her person and estate upon the ground that she was physically incapable of caring for her property.'' Proponent testified that at the time of the above discussion, Mrs. Dopkins "had recovered to where she was rational at all times.'' Proponent Oliver called at Carter's office on the same or the following day "and communicated to him the desires of Mrs. Dopkins in the above connections.'' Oliver testified that on several other occasions Mrs. Dopkins had asked to have such a will drawn "and with practically the same information in it''; that he had "tried . . . to get her to change that'' and provide for others in her will; that he "did not try to influence her . . . at all . . . in the making of the will as it was made''; that "Whenever anyone tried to steer her, then she would back up; anyhow, I could not do anything with her . . . Very seldom I could ever get her to do anything she did not want to.''

On July 30, 1946, Mrs. Dopkins was discharged from the hospital and taken to proponent's home in Reedley, where she was cared for by a practical nurse procured by proponent. Proponent testified that she was taken to his home rather than her own because the latter was then being redecorated. About noon of the same day, July 30, "pursuant to arrangements made with Mrs. Dopkins through Lyle B. Oliver,'' Mr. Carter met with Mrs. Dopkins at Oliver's home to deliver the will and a request for Appointment of Guardian. Oliver introduced Mr. Carter to Mrs. Dopkins and then left the room and returned to the hospital to pick up certain of Mrs. Dopkins'

personal belongings which had been left there. During proponent's absence Mr. Carter "explained to Mrs. Dopkins the effect of the request and the appointment of a guardian, and he also discussed with her the terms and provisions contained in the will and the legal effect thereof. She thereupon signed the documents after approving the contents thereof and after obtaining attesting witnesses who witnessed the execution of the will.'' The attesting witnesses were Mr. Carter and Mr. C. H. Green, a neighbor and acquaintance of Mrs. Dopkins, who had been ''called in'' by proponent. Mr. Carter testified that during his discussion with Mrs. Dopkins she stated ''that it was her chief concern to see to it that Lyle Oliver got her property, . . . that she had certain relatives, but that they had done nothing for her and that she wished to make no provision for any of them, and that Lyle Oliver had been very kind to her, and that she had done all for her relatives that she felt they were entitled to''; that he then asked her what property she had and she described it in detail; that he explained to her that under the terms of the will ''no relatives would get anything, and that Mrs. Dopkins stated she wanted to be very sure of that; that she mentioned certain of the Dopkins family by name, and remarked that it appeared to her that they were merely awaiting her death.''

On July 31, 1946, a petition was filed requesting the appointment of proponent as guardian of the person and estate of Mrs. Dopkins, on the ground of the latter's physical incapacity. On August 9, 1946, the court made its order appointing proponent as her guardian; the order expressly specifies that the appointment was based upon the ward's physical incapacity. Thereafter, upon completion of the redecorating work, ''Mrs. Dopkins removed to her own home in Reedley'' where proponent and the practical nurse continued caring for her until her death on December 23, 1946.

Concerning Mrs. Dopkins' mental capacity and the claim that proponent influenced her, the settled statement relates among other things that ''The testimony of all witnesses disclosed that the decedent directed all her business operations and affairs, continuously, both before and after the execution of the will, and that by virtue of such direction her properties were steadily increased and enhanced in value.

''While the testimony showed certain personal eccentricities on the part of the decedent, no witness testified that in his or her opinion the decedent lacked capacity to understand the nature of the testamentary act; to recall her property, or to remember the relationship of persons related to her.

"There was no testimony whatever that beneficiary under the will at any time exerted any influence over the decedent, or exerted any pressure upon her mind concerning the disposition of her property. . . .

"Mrs. Korn, the nurse who began her attendance upon Mrs. Dopkins the day of the execution of the will, and continued her attendance upon her until her death, testified that . . . Mrs. Dopkins was a very strong-minded person, and would be extremely hard to influence; that during her attendance upon her from time to time Mrs. Dopkins mentioned various relatives, and the vicinity in which they lived, and subsequent to the date upon which the will in question was executed, Mrs. Dopkins referred to it a number of times in her conversations, and indicated that she was fully aware of its terms and the fact that no provision was made therein for her relatives . . .

"C. H. Green, who was one of the subscribing witnesses to the will, testified that in his opinion Mrs. Dopkins was fully aware who her relatives were at the time she executed the will, and what property she owned and possessed, and that she discussed both of these matters and stated that she wanted her property disposed of in the manner provided for in the will. That to him she appeared to know and to be aware of all her property and exactly what she wanted to do with it.''

Concerning his own associations with decedent prior to the making of the will, proponent testified that he had consulted with her concerning her business matters for approximately one year prior to her move to Reedley in 1945; that at or near the time of her move to Reedley Mrs. Dopkins sold her ranch, on which she had been residing, to proponent's father, but that she had not consulted proponent about the matter, ''The deal was actually made before I knew it.'' Shortly thereafter Mrs. Dopkins lent $10,000 for one year to proponent and to his father to be used to ''level'' the former Dopkins ranch; at the end of the year when repayment of the loan was offered Mrs. Dopkins stated that ''she did not want the money; she wanted to keep it working for her'' and continue receiving interest thereon, and ''that is what was finally done''; proponent ''was worth around $50,000'' at the time of the loan, and so informed Mrs. Dopkins.

██ Contestants' first contention is that the court erred in refusing to give their following requested instruction:

"You are instructed that where a confidential relationship exists between the testatrix and the beneficiary under the will,

coupled with activity on the part of the beneficiary in the preparation of the will, and is profiting unduly thereby, casts upon the proponent the burden of showing that the will was not the product of such imposition and you are further instructed that the mere fact that the will was executed out of the presence of proponent does not in itself refute the charge of imposition or presumption. It is a circumstance, however, to be considered by you.''

The quoted instruction appears to be an attempted translation of the rule set forth in *Estate of Graves* (1927), 202 Cal. 258, 262 [259 P. 935] (see, also, *Estate of Yale* (1931), 214 Cal. 115, 122-123 [4 P.2d 153]; *Estate of Teel* (1944), 25 Cal. 2d 520, 527-528 [154 P.2d 384]; *Estate of Miller* (1936), 16 Cal.App.2d 154, 166-168 [60 P.2d 498]; *Estate of Eakle* (1939), 33 Cal.App.2d 379, 382 [91 P.2d 954]; *Estate of Anderson* (1938), *supra,* 29 Cal.App.2d 637, 640; *Estate of Abert* (1949), 91 Cal.App.2d 50, 58 [204 P.2d 347]) that ''Three well-established facts, among others, which are recognized as being indicative of undue influence, or a subversion of a decedent's volition, stand out clearly in the record: The relations between appellant and the decedent afforded to appellant an opportunity to control the testamentary act; the decedent's condition was such as to permit of a subversion of her freedom of will; the appellant was active in procuring the instrument to be executed. In addition, appellant unduly profited as beneficiary under the will. While none of these circumstances, standing alone, has the effect of creating a presumption against the validity of the instrument, their probative force, in combination, is to *impose upon the proponent the obligation of presenting evidence of volition, and to make the question as to undue influence one of fact for the jury's determination.''* (Italics added.)

Although it is apparent from the record as summarized hereinabove that there is some evidence of the factors which will raise a rebuttable presumption of undue influence; i. e., (1) a confidential relationship; (2) decedent's condition such as to permit of a subversion of her freedom of will; (3) activity in procuring the instrument to be executed; and (4) profiting by the will, it is likewise apparent that the instruction which was refused is uncertain and confusing and that it fails to set forth any rule of law which conceivably could have affected the verdict favorably to contestants. Moreover, such instruction obviously suggests to the jury as a fact, that there was ''such imposition'' by the beneficiary under the

will, and is therefore erroneous in invading the province of the jury. (See *Waack* v. *Maxwell Hardware Co.* (1930), 210 Cal. 636, 641-643 [292 P. 966]; *Collins* v. *Hodgson* (1935), 5 Cal.App.2d 366, 371 [42 P.2d 700].) ■ On a technical detail of the law such as was apparently attempted to be explained in the refused instruction the appellants were bound to request a proper and intelligible instruction if the refusal to instruct is to constitute ground for reversing the judgment; as declared in *Nelson* v. *Southern Pacific Co.* (1937), 8 Cal.2d 648, 653 [67 P.2d 682], "it has been frequently held that where instructions are offered which cannot properly be given without modification the court may refuse to give them. [Citations.]" (See, also, *Hart* v. *Farris* (1933), 218 Cal. 69, 75 [21 P.2d 432]; *Jones* v. *Bayley* (1942), 49 Cal.App.2d 647, 656 [122 P.2d 293].) Actually, the record shows that here proponent *did* present evidence of volition, the question of undue influence *was* determined by the jury, and the rule of the Graves case was not violated.

■ Contestants next urge that the court erred in giving three instructions requested by proponent relating to undue influence.[1] Although contestants concede that each of the three instructions "by itself was all right," they contend that "In substance, the Court singled out the several necessary elements giving rise to the presumption of undue influence, and stated and emphasized in effect that a confidential rela-

---

[1]Such instructions read as follows:

No. 14. "In order to establish that a will has been executed as a result of undue influence, it is necessary to show not only that such influence has been exercised, but also that it has produced an effect upon the mind of the testator by which the will, which he executes, is not the expression of his own desires. The presumption of undue influence is not raised by proof of interest and opportunity alone. In order to set aside a will for undue influence, there must be substantial proof of a pressure which overpowered the volition of the testator at the time the will was made. Undue influence consists in the exercise of acts or conduct by which the mind of the testator is subjugated to the will of the person operating upon it, some means taken or employed which have the effect of overcoming the free agency of the testator and constraining him to make a disposition of his property contrary to and different from what he would have done had he been permitted to follow his own inclination or judgment."

No. 15. "You are instructed that there is no legal suspicion of undue influence arising from the existence of a relationship which is affectionate and confidential; and you are further instructed and advised that the existence of such a relationship, if you believe there was one, does not in and of itself impose upon Lyle B. Oliver

tionship of itself did not give rise to a presumption of undue influence; that profiting unduly by the will did not give rise to such undue influence; that active procuration of the execution of the will did not give rise to this presumption even where there was opportunity. The Court in giving these instructions really told the jury that none of the essential elements of the rule gave rise to the presumption of undue influence.'' The answer to contestants' complaint is again readily found in the instructions themselves, which make no mention of the ''elements'' of profiting unduly and of active procuration, but are confined to a discussion of confidential relationship and of ''interest and opportunity.'' It is obvious, therefore, that none of the three instructions singly, nor do all of them together, purport to cover all the law on the subject or to negative the rule for which contestants contend. It follows that contestants' position on this point is without merit.

 Contestants next assert error in refusing to give three of their requested instructions, the first of which reads as follows:

''You are instructed that the judgment of August 9, 1946, in the Guardianship proceeding of Mrs. D. H. Dopkins was evidence of the mental condition of Mrs. D. H. Dopkins on that date, and would justify an inference that Mrs. D. H. Dopkins lacked testamentary capacity at that time.'' Each of the other two of such requested instructions stated, among other things, that the judgment of August 9, 1946, appointing a guardian for Mrs. Dopkins, could only have been entered ''providing the court found that she was at the time of said judgment an 'incompetent person' or 'incompetent' or 'mentally incompetent,' . . . The incompetency above mentioned must be understood to mean a mental inability rather than a physical inability.''

---

the necessity of assuming the burden of proof that he had not unduly influenced Virginia Estelline Dopkins in the making of her will.''

No. 17. ''You may believe from the evidence in this case that a friendly and confidential relation existed between Virginia Estelline Dopkins and Lyle B. Oliver, but you are instructed that no warrant is given to a jury to find that undue influence was exerted at the time the will was made from proof merely of such friendly and confidential relation alone. Assuming that you believe it to be the fact that the relation between Virginia Estelline Dopkins on the one hand, and Lyle B. Oliver on the other hand, was affectionate and confidential, and that Lyle B. Oliver would and did have a general influence over said Virginia Estelline Dopkins, proceeding from such relation, you are instructed that the existence of such relation and this general influence raises no presumption that undue advantage was taken of it by Lyle B. Oliver.''

As already mentioned, the appointment of the guardian was sought and was ordered by the court upon the expressly delimited basis of physical incapacity of Mrs. Dopkins. Contestants urge that their contention that they were entitled to the three requested instructions to the effect that such appointment connoted mental inability is supported by *Matter of Coburn* (1913), 165 Cal. 202, 212 [131 P. 352]; *Guardianship of McConnell* (1938), 26 Cal.App.2d 102, 104-105 [78 P.2d 1043]; *Estate of Krause* (1945), 71 Cal.App.2d 719, 725 [163 P.2d 505]. The guardian of Mrs. Dopkins was presumably appointed under the provisions of section 1460 of the Probate Code, formerly found in section 1767 of the Code of Civil Procedure.[2] It is true that in *Matter of Coburn, supra,* the court stated that the inability upon which such guardianship proceedings are based "must be understood to mean a mental, rather than a physical inability." Nevertheless, the appointment in the Coburn case was based upon express allegations in the petition, found by the court to be true, that the ward was "mentally incompetent to manage his estate . . . and that he is, by reason of old age and physical disability and weakness of mind, unable to take care of himself and manage his property." (P. 207 of 165 Cal.) In *Guardianship of McConnell, supra,* there was both testimony and a court finding of "senile mental deterioration" (p. 105 of 26 Cal.App.2d); and in *Estate of Krause, supra,* although the opinion declares that (p. 725 of 71 Cal.App.2d) "The judgment of May 17th in the guardianship proceeding was evidence of the mental condition of Mr. Krause on that date," the allegations, evidence, or findings upon which such judgment was based are not indicated.

Moreover, as pointed out by proponent, the Coburn case holding was based in part upon the provisions of then section 1763 of the Code of Civil Procedure to the effect that "When it is represented to the superior court . . . upon verified pe-

---

[2]Section 1460 of the Probate Code reads as follows: "Any superior court to which application is made . . . may appoint a guardian for the person and estate or person or estate of an insane or incompetent person. As used in this division of this code, the phrase 'incompetent person,' 'incompetent,' or 'mentally incompetent,' shall be construed to mean or refer to any person, whether insane or not, who by reason of old age, disease, weakness of mind, or other cause, is unable, unassisted, properly to manage and take care of himself or his property, and by reason thereof is likely to be deceived or imposed upon by artful or designing persons."

tition . . . that any person is insane, or from any cause *mentally* incompetent to manage his property'' (italics added) notice should be given, a hearing held, etc. When in 1931 the provisions of section 1763 of the procedural code were recast and enacted into section 1461 of the Probate Code the adjective "mentally" was omitted, and thenceforth, proponent urges, the petition has needed only to allege "that a person is insane or incompetent," etc. But in this case it is unnecessary for us to and we do not determine whether the Legislature intended to obviate, and has in fact dispensed with, the requirement that mental incompetency be shown. Even if we assume (and we expressly declare that we intend no implication one way or the other) that the court in appointing a guardian for Mrs. Dopkins for physical inability only may, under the declaration of the Coburn case, have exceeded its power (or its jurisdiction), nevertheless the contestants may not claim error—and certainly not prejudicial error—in the refusal of the trial court in the instant case to instruct the jury that the appointment of the guardian, made on the expressly limited ground of physical inability, connoted a mental inability. Regardless of whether the guardian was properly or improperly appointed the fact is undisputed that the appointment, for whatever it was worth, was based solely on the allegation and finding of *physical* inability; hence, obviously, it is not evidence of mental incapacity. (See, also, holdings in *Estate of Johnson* (1927), 200 Cal. 299, 305 [252 P. 1049]; *Estate of Worrall* (1942), 53 Cal.App.2d 243, 246 [127 P.2d 593]; and *Estate of Powers* (1947), 81 Cal.App. 2d 480, 483-484 [184 P.2d 319], that an adjudication of incompetency in a guardianship proceeding is not applicable to testamentary capacity and does not constitute prima facie evidence of testamentary incapacity.)

▇ Contestants' next contention concerns a comment made by the trial court in the jury's presence. On cross-examination of proponent, counsel for contestants read aloud the provisions of section 1460 of the Probate Code, discussed hereinabove, and asked proponent whether the attorney, Mr. Rae Carter, had read the same provisions to him prior to his appointment as guardian of Mrs. Dopkins. The following thereupon ensued:

"A. He did not read that to me.

"Q. You knew about it, though, didn't you? You knew she had to be declared mentally incompetent?

"Mr. LINNEMAN [counsel for proponent]: Just a moment,

your Honor, please, I don't think that is the fact, what counsel refers to, and we object to that on that ground. I don't think that is the law, and furthermore it is asking for the conclusion of the witness concerning a matter of law.

"THE COURT: I don't think it is the law, either, and I will sustain the objection upon that ground."

Contestants assert that by the quoted remark the court declared it "did not believe a Code Section to be the law," and thereby rebuked counsel for contestants and put them "in the lights that they were not clearly reading the law." It is clear, however, that by the quoted statement the court meant that it did not believe a declaration or finding of mental incompetency was essential to the appointment of a guardian for Mrs. Dopkins. That expression of belief, it is obvious, was but an incidental reaffirmation of the view formally evidenced by the order appointing the guardian, hereinabove discussed. Whether or not the court's belief was legally correct is not a question material to the decision of the issues before us. The expression was incident to ruling upon a proposition of law raised by the question and the objection thereto. For reasons already fully discussed the ruling was correct and the court's comment in making the ruling does not in the circumstances, upon any view of the matter, constitute prejudicial error.

Finally, contestants urge that the court erred in permitting proponent, over objection by contestants, to testify that during Easter holidays, some three months after Mrs. Dopkins' death, he visited her grave to decorate it and found no decorations of the grave other than those which he and his mother provided. Although this evidence of events occurring subsequent to testatrix' death may not be wholly relevant or at all material to the issues in this case, it was at worst (from contestants' standpoint) but cumulative of testimony set out hereinabove concerning the regard and concern felt by proponent for Mrs. Dopkins and the lack of such sentiment on the part of contestants, and cannot be held to constitute prejudicial error.

The judgment is affirmed and the attempted appeal from the order denying motion for a new trial is dismissed.

Gibson, C. J., Edmonds, J., Traynor, J., and Spence, J., concurred.