[Civ. No. 8956. Third Dist. Apr. 8, 1957.]

Estate of OLIVE A. LOUNSBERRY, Deceased. WILLIAM HINDIN, Appellant, v. FREDERICK W. LOUNSBERRY, Respondent.

Laughlin & McKalson and Francis R. Crable for Appellant.

Husted, Pinney & Smith, William M. Pinney, Jr., Donald V. Smith and Guernsey Carson for Respondent.

VAN DYKE, P. J.—This is an appeal from an order admitting to probate a formal will which a jury found the 74-year-old testatrix executed when she was of sound mind and not acting under the undue influence of respondent. ▆ Appellant does not attack the sufficiency of the evidence to support the jury's findings, but assigns as error the trial court's order granting a nonsuit on the ground of fraud, and certain rulings in the rejection of evidence. ▆ Procedurally, the granting of the nonsuit was incorrect. (*Estate of Jamison*, 41 Cal.2d 1, 6 [256 P.2d 984].) ▆ However, the scope of review is the same as if a verdict had been directed on that issue. ▆ In determining the validity of the nonsuit, the evidence must be viewed in the light most favorable to appellant who is the contestant herein.

Appellant is not an heir of the testatrix, but he and his wife were her closest friends for nearly 20 years and were devisees under an earlier will. Respondent is the sole beneficiary under the probated will.

Appellant contends that the jury could have found from the evidence that the testatrix was induced to make the will by promises which respondent made without intent to perform. (Civ. Code, § 1572, subd. 4.) From the evidence hereinafter set forth it could reasonably be inferred that the testatrix made the will in reliance on respondent's representations. (*Estate of Carson*, 184 Cal. 437, 442-444 [194 P. 5, 17 A.L.R. 239]; see also *Estate of Newhall*, 190 Cal. 709, 720-721 [214 P. 231, 28 A.L.R. 778].) The question then is whether there is evidence to support the charge that the representations were false and fraudulent.

Respondent is the testatrix's former husband from whom she obtained a divorce in 1933. Respondent remarried and lived with his wife, Madeleine, until October 16, 1952, the day on which the will was executed. They owned a small home in Orland. Their only income for several years had been respondent's old age pension. The testatrix lived alone on her ranch near Orland. The respondent testified that in 1940 the testatrix told him that their divorce had been a mistake, and that if he were ever free, she would like him to come back to her. Respondent further testified that early in October of 1952 the deceased sent for him and told him that she was having trouble with appellant and was afraid of him. Respondent promised to protect her and told her that his wife was going to leave him and return to France. Respondent and the testatrix planned between themselves that if and when that happened they two would sell their properties and go to Reno, where respondent would get a divorce and remarry the testatrix.

On the morning of October 16, 1952, respondent and his wife entered into a property settlement agreement under which he agreed to pay her $2,750, and she agreed to deed him her interest in their home. In order to make the agreed payment, respondent borrowed $2,500 from a friend. The money and deed were placed in escrow. A few days later the money was released to Madeleine and she left Orland, presumably for France.

On the afternoon of October 16, 1952, the aforementioned friend drove respondent and the testatrix to Chico where she consulted Mr. Peters, an attorney at law. Respondent introduced the two and then left. Mr. Peters testified that the testatrix told him that she wished to make a will in favor of respondent and did not wish to leave any of her property to her relatives in Illinois as they were not close. She also advised him that she was having trouble with appellant, who refused to return certain papers to her, including her earlier will and an insurance policy of which he was the beneficiary. Apparently for this reason the attorney suggested she give a power of attorney to respondent. Mr. Peters testified that there was no question in his mind as to testatrix's mental capacity and understanding. He said the will was prepared in accordance with her wishes and directions. The following day the respondent and deceased returned to Mr. Peters' office, where the deceased executed the power of attorney and the will which was witnessed by Mr. Peters and his secretary.

Two days later respondent moved into the testatrix's home and the two lived there until January 27, 1953, when the deceased had a cerebral hemorrhage and was taken to the hospital where she died on February 6, 1953, after having three more cerebral hemorrhages. However, while in the hospital, on January 28th, she signed three checks. They were drawn on her joint account with respondent, to which account he had had her funds transferred. One check was to pay Mr. Mello the $2,500, which respondent owed him, one was to pay the taxes on the testatrix' ranch and the third, in the amount of $200, was for respondent's use. On the same day the deceased executed a deed to the ranch to respondent and herself as joint tenants. After her death, that deed was set aside on the grounds of undue influence and incompetency in a suit brought against respondent by appellant here, acting in the capacity of special administrator of decedent's estate. In that action and regarding the allegations of a second count charging misuse of the power of attorney, the court found: "That on or about the 15th day of October, 1952, the defendant Frederick W. Lounsberry who was then and there married to Madeleine Lounsberry, represented and promised to the decedent that he would divorce his said wife and would marry the decedent and live with and care for her for the rest of her life and would safeguard, manage and care for her property both real and personal in her interest and behalf; that at said time the said promises and representations were false in this, to wit: That said defendant had no intention to fulfill and keep the same; that the decedent relying upon said promises and representations of the said defendant made and constituted him her general attorney in fact and entrusted to him the joint managership and control of a certain bank account in the Orland Branch of the Bank of America NT&SA of which she was theretofore in sole control and which was her sole property."

We will first consider the rulings on evidence which appellant assigns as error. The trial court refused to admit in evidence the quoted findings made in the prior action. Appellant argues that the quoted findings estop respondent from denying that his promises were made without intention to perform. In order to consider this assignment of error, it is necessary to examine the pleadings, the findings and the judgment in the prior action. The complaint contained several causes of action, but we are concerned only with the first two. By the first count the plaintiff, appellant here, as

special administrator of decedent's estate, sought to have a certain deed, conveying real property to Lounsberry, set aside upon grounds stated. These grounds were as follows: That on January 28, 1953, while decedent was confined in a hospital suffering from severe physical and mental illness, she executed the subject deed; that at that time and place decedent suffered hypertension, which affected her brain, was 74 years of age, weak of mind and unable, unassisted, to properly care for herself or her property; that Lounsberry knew this, and with the purpose of profiting himself thereby, persuaded her to execute the deed through which he now claimed ownership of the property. The relief sought on this first cause of action was to have the deed declared null and void, and the property restored to the estate of decedent. In the second count the pleader repeated his assertions as to the physical and mental condition of decedent, and further alleged as follows: That Lounsberry, on or about the 1st of October, 1952, knowing the mental and physical condition of decedent "falsely and fraudulently represented to the decedent that he was not married to said Madeleine Lounsberry, and that he would thereafter live with and care for decedent, and safeguard, manage and look after her property, both real and personal, in her interest and behalf; that said false and fraudulent representations were made pursuant to the said plan and intention of the said Frederick W. Lounsberry, and as part and parcel of a scheme of said defendant to acquire dominion over the decedent's mind and will, and to secure for himself her property." That pursuant to that plan, Lounsberry, on or about October 16, 1952, persuaded the decedent to appoint him as her general attorney in fact, and thereafter, acting under color of his authority and power as such attorney in fact, he appropriated to his use large sums of money belonging to decedent and kept and retained the same, refusing to pay over any part thereof to the plaintiff. The relief asked as to this count was that Lounsberry be compelled to account to the decedent's estate for all the money that had come into his hands as her attorney in fact, and when the amount was ascertained, that he be ordered to pay the same over to the plaintiff as administrator. It is to be noted that the first count places no reliance upon and contains no allegations of fraudulent representations. It is also to be noted that the allegations of fraud in the second count are wholly immaterial to the cause of action therein stated. That cause of action depends wholly upon the fraudulent use by Lounsberry of a power of attorney

whereby he obtained decedent's property. It made no difference how he obtained the power of attorney. Whether he got it honestly or induced its execution fraudulently neither added to, nor detracted from, the right of the administrator to compel him to turn in to the estate any sums of decedent's obtained by him by the use of the power. The result is that the findings of fact concerning false and fraudulent representations consisting of promises made without intention of performing the same were wholly unnecessary to the decision of the court in the cause. The judgment, responsive to the first count, declared that the deed was cancelled, annulled and set aside for all purposes; it ordered and directed Lounsberry to account to the plaintiff as special administrator for the rents, issues and profits of the real property. Responsive to the second count, the judgment ordered Lounsberry to account for all money of the decedent received by him subsequent to the 16th day of October, 1952.

In *Mason* v. *Del Valle*, 213 Cal. 30 [1 P.2d 419], wherein plaintiff instituted an action to enjoin the use and maintenance of a pipeline across his property by the defendant city of Los Angeles, the defendant imposed two special defenses: (1) That a public use had intervened, and, (2) That the city had acquired by prescription a right of way across plaintiff's property for the maintenance of the line. The complaint prayed only for an injunction. The answer prayed for no affirmative relief, and as the Supreme Court said, the issue of injunction was therefore the sole issue before the court. The court denied the injunction, stating in the judgment that it did so upon the ground that the benefit to the plaintiff of the injunction prayed for would be much less than the detriment to the defendant which would follow its issuance. The judgment continued, however, to decree that the denial of the injunction was without prejudice to the maintenance by plaintiff of an action for damages, if any, occasioned by the trespass of the city through the maintenance and use of the pipeline across plaintiff's property. The city appealed from all of the judgment, except the part denying the injunction, and urged that the provisions of the judgment having reference to the maintenance by plaintiff of an action for damages, coupled with certain findings of fact and conclusions of law, would amount to an adjudication against the city upon the issues it had tendered concerning prescription. Discounting the possibility that such result could arise from the record, the Supreme Court said:

". . . The judgment is the only real conclusion of law and displaces all former statements in the findings on the subject. . . .

"Even if it be conceded that the judgment might have been broader under the findings of fact, it does not follow that such issues as were not determined by the judgment have become *res judicata* because of the language of the findings. The safe rule seems to be that only such issues have become *res judicata* as were properly adjudicated in the judgment. . . . [T]he judgment does not purport to settle any issue save alone the issue of injunction based upon the ground of the intervention of a public use."

In *Hamilton* v. *Hamilton*, 109 Cal.App.2d 145 [240 P.2d 14], the wife had filed a suit for divorce during the existence of which the parties had become reconciled, and she dismissed the action. Shortly thereafter, the husband sued the wife for divorce, and she cross-complained. The court found that by an agreement in writing during the pendency of the first action the parties had settled their respective rights to community property, and that a promissory note executed to the wife by the husband during negotiations for property settlement during the first suit had not been paid. Notwithstanding this finding and other findings on property issues, the interlocutory decree thereafter entered made no mention of the property settlement agreement or of any of the findings with respect thereto and provided only that the wife was entitled to a divorce. Thereafter, the wife sued upon the promissory note and after an adverse judgment contended on appeal that the findings of fact and conclusions of law in the second divorce proceeding constituted the decision of the court and therefore the matters found therein were res judicata in the third action on the note. In its opinion the court cited 1 Freeman on Judgments, fifth edition, page 6, section 3, wherein the text writer states:

" 'There is a distinction between the findings and conclusions of the court and its judgment. While they may constitute its decision and amount to the rendition of a judgment they are not the judgment itself. They amount to nothing more than an order for judgment, which must, of course, be distinguished from the judgment.' "

Said the court further:

"It necessarily follows that since the trial court in the second divorce case did not carry the findings and conclusions

into the interlocutory judgment that judgment was not res judicata on the question of the note."

We quote the following from 2 Freeman on Judgments, fifth edition, section 692:

"It is not necessary to the conclusiveness of the former judgment that the issue should have been taken upon the precise point which it is proposed to controvert in the collateral action. It is sufficient if that point was essential to the former judgment. If the facts involved in the second suit are so cardinal that without them the former decision cannot stand, they must be taken as conclusively settled . . .

"While the effect of the judgment as an estoppel is limited to matters involved in the litigation, it is equally conclusive whether the point decided was of itself the ultimate vital point or only incidental, if its determination was necessary to the judgment . . . A judgment is a conclusive adjudication of every matter both of law and fact the determination of which is essential to support it."

We take the following from section 693:

"Matters which follow by necessary and inevitable inference from an adjudication because the judgment could not have been rendered without determining them are as effectually concluded thereby as those specifically and in terms adjudicated."

■ Applying the foregoing rules to the instant case, it is seen that the judgment upon the second cause of action following the findings concerning the false representations made with respect to the execution of the power of attorney depended not at all upon such findings. Consequently, it was not adjudicated so as to become an estoppel in a collateral action that Lounsberry made promises to decedent without intent to perform them. The trial court was correct in excluding the offered evidence. For the reasons given that part of the judgment which decreed cancellation of the deed of January 28, 1953, likewise offered in evidence, raised no estoppel so far as the issues in the present action were concerned.

■ Appellant maintains that the trial court erred in refusing to admit into evidence the interlocutory decree which granted the testatrix a divorce from the respondent. He contends that the decree would have rebutted respondent's testimony that the divorce was "trumped up" by a "shyster lawyer" and that neither he nor the testatrix "fought the divorce." The findings and interlocutory decree in the divorce action would have had no such probative value. Moreover,

counsel stipulated that the divorce action was very "acrimonious." There was no error in refusing to admit into evidence the findings and decree in the divorce action.

 We now turn to appellant's main contention, which is that, without regard to the evidence refused by the court, there was sufficient evidence in the record to justify submitting to the jury the issue of whether or not the will of decedent had been procured by fraud. Upon this subject the contestant's pleading, after alleging the weakened physical and mental condition of decedent, pleaded that Lounsberry, prior to October 16, 1952, had represented and promised decedent that, if she would leave all her property to him by a will and would constitute him her attorney in fact under a general power of attorney, he would put away his wife with whom he was then living and send her to France, live with and care for decedent for the rest of her life, handle and manage her property in her interest and behalf and protect her from certain individuals who had threatened to harm her and take her property from her; that these representations and promises were false and known by Lounsberry to be false when made; that he had no intention of sending away his wife or caring for decedent for any period longer than that necessary to secure full control of her property; that no person was threatening to harm or molest her in any way or deprive her of any property; and that the representations and promises were made with the sole object and aim of fraudulently procuring the execution of decedent's will in Lounsberry's favor and securing control of her property during her lifetime; that in reliance upon said promises and representations decedent executed the will and delivered to Lounsberry her general power of attorney, which power he thereafter exercised to his advantage and her loss; that except for the said promises and representations decedent would not have executed the will. There was no direct evidence that anything said to decedent by Lounsberry was said in the way of a bargain being made. But there was proof of the following statements and promises made to decedent by him; That he and his wife Madeleine were separating, dividing their property, and that she intended to go to France, from which country she came to America; that decedent and Lounsberry, after he and Madeleine had separated and adjusted their affairs and Madeleine had gone, would mutually dispose of their properties; that they would then go to Reno, where he

would establish a residence and obtain a divorce from Madeleine; that he would then remarry the testatrix. The element of fraud alleged, however, and which was lacking in proof was that when he made these statements and promises, he did not intend to carry them out. Of this there was, as might have been expected, no direct testimony. The proof was that he and Madeleine did separate, and that Madeleine departed from the area where they had lived. Whether she went to France or not was not shown. There was proof also that immediately thereafter Lounsberry and decedent both listed their several properties for sale with the several brokers, and that no sale was forthcoming prior to the time that decedent became ill and was hospitalized, where in a short time she died. No inference, therefore, that Lounsberry failed to carry out any promise made in the way of going to Reno and divorcing Madeleine and marrying decedent can be inferred from the record, for decedent and Lounsberry were engaged in carrying out the promised plan when it was interrupted and further performance was made impossible by decedent's illness and sudden demise. Lounsberry could have transferred to decedent an interest in his home in Orland. He did not. But nothing can be made of this in view of the fact that, so far as the record shows, the two were engaged in selling their properties and converting them into money. Any division promised or planned would naturally await the sale and take effect as to the money derived, so no breach of that promise could be inferred. No breach of any promise from which there might have been inferred an intent not to keep the promise when made having been shown and there being nothing else, we conclude that from the whole record there was no evidence of fraud, and that the court did not err in granting a nonsuit on that issue, save in the way of procedure as hereinbefore discussed.

Appellant makes certain contentions that the trial court erred in the giving and refusing of instructions. We have examined these matters and find no merit in them. We think it unnecessary to discuss them in detail.

The order appealed from is affirmed.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied April 30, 1957, and appellant's petition for a hearing by the Supreme Court was denied June 7, 1957. Carter, J., was of the opinion that the petition should be granted.