[Civ. No. 9527. Third Dist. July 31, 1959.]

Estate of JOHN LLOYD McCULLOUGH ROBBINS, Deceased. MARY EMMA ROBBINS SUTTON et al., Appellants, v. BEATRICE CLAYTON ROBBINS as Executrix, etc., Respondent.

Dodge & Evans, Dunnell, Herbert & Dunnell and Hilde-
brand, Bills & McLeod and Robert P. Brorby for Appellants.

Henry H. Kilpatrick, J. Clinton Peterson, Dwight C. Ely,
Burt D. Goodman and Kenneth L. Jones for Respondent.

VAN DYKE, P. J.—This is an appeal from an order ad-
mitting to probate the will of John L. M. Robbins, deceased,
over the objections of appellants, who contested the probate
of the will upon the grounds (1) that it was executed under
the undue influence of the proponent, respondent herein, and
(2) that the decedent was mentally incompetent to execute
the will. At the close of contestants' case the court granted a
"nonsuit" as to the undue influence ground of contest and
submitted to the jury only the issue of testamentary capacity.
The jury's verdict found the decedent to have possessed the
requisite testamentary capacity and thereafter an order was
made admitting the will to probate.

Although the procedure of granting a nonsuit may
have been technically incorrect (see *Estate of Jamison*, 41 Cal.
2d 1, 6 [256 P.2d 984]), the variance is immaterial here. The
scope of review as to the propriety of the court's action in not
submitting the issue of undue influence to the jury is the same
as if a verdict had been directed on that issue. The evidence
must be viewed in the light most favorable to the appellants.
(*Estate of Lounsberry*, 149 Cal.App.2d 857, 858 [309 P.2d
554].)

We shall first consider the contentions of appellants that
the court erred in not submitting the issue of undue influence
to the jury, and in doing so will consider only the evidence
pertinent to that issue. Testator was an attorney at law, al-
though his practice had been largely confined to the field of
probate law. He was a rancher and an investor, and through-
out his life had been active in the management of his own
affairs, which were extensive. He died June 5, 1955, at the
age of 79 years. He left an estate valued at approximately
three and one-third million dollars. He had inherited from his
parents the foundation of his later fortune. He was survived

by his widow, Beatrice Clayton Robbins, proponent herein, whom he had married on November 30, 1953, after the death of his first wife in 1950. He was childless and appellants are his collateral heirs. The will which was admitted to probate was executed by decedent on December 28, 1953, and it left his entire estate to Beatrice. The contestants William C. Robbins, Mary Emma Robbins Sutton, Marie Robbins Hilbert, are brother and sisters of decedent. Contestants Irving W. Robbins, Jr., and Martha D. Ireland are children of decedent's predeceased brother, Irving. They are all people of wealth.

In 1938, the testator hired Beatrice as a secretary and payroll clerk to assist in the handling of his properties. She maintained this position until the time of her marriage to testator. In 1941 testator suffered a stroke, which left him partially paralyzed in his right arm and right leg. He thereafter used a cane when walking, needed assistance in putting on his coat and changed from his right to his left hand for writing purposes. From 1943 on Beatrice acted also as testator's chauffeur. Following the death of testator's first wife he destroyed a will which had theretofore been executed by him, and thereafter remained without a will until after his marriage to Beatrice. On February 7, 1952, when he was about 77 years of age the testator suffered a second stroke which kept him in bed for approximately three weeks under the care of a nurse. On October 8, 1953, he suffered a third stroke which affected his speech, and his speech remained somewhat affected until his death in 1955. On November 30, 1953, he married Beatrice, and a little more than a week thereafter executed a will in her favor, which left her all his property, and which, save for minor language differences, was practically identical to the will admitted to probate.

On December 8 or 9, 1953, Beatrice accompanied testator to the office of his attorney. This attorney was an old-time acquaintance of the testator and for a considerable period of time had performed professional work for him. In the presence of Beatrice the testator instructed his attorney to draw a will, leaving everything to her and naming her as executrix. On the following day testator and Beatrice returned to the attorney's office, where he read the will, announced that it was in accordance with his wishes, and signed the same. In affixing his signature he signed in a blank provided for the signature of a witness. The attorney called this to his attention and upon the attorney's suggestion the testator scratched out the misplaced signature and signed again in the correct place. Imme-

diately upon the execution of the testator's will, Beatrice instructed the attorney to draw up a will for her, leaving her entire estate (valued at some $50,000) to the testator. They waited while the will was typed and she executed it in the presence of the testator. The testator took both of the wills, and Beatrice drove him to the bank, which he entered, and it may be inferred that he put the wills into his safe deposit box. On December 28, 1953, Beatrice again drove the testator to the attorney's office, but this time she waited outside in the car and did not go in with him. The testator told the attorney that he wanted to have his will redrafted as he had become concerned over the erroneously-placed signature and its erasure, which at least marred the appearance of the document. Under his instructions and in his presence a new will was typed, practically identical with the executed will. It was executed by the testator while in the attorney's office and was witnessed by the attorney and by an associate. Having executed the last will, the testator, while in the attorney's office, destroyed the prior will by tearing it up and throwing the pieces into a wastebasket. On April 11, 1955, the testator suffered a fourth stroke and was placed under the care of a nurse. On May 23d following he directed Beatrice to close his safe deposit box, which she did. The contents of the box, which included her December 10th will and the testator's December 28th will, were kept in his home. On June 2, 1955, he suffered a fifth stroke and on June 5th following he died.

The mental and physical conditions of a testator are factors to be considered on the issue of undue influence. (*Estate of Jamison, supra*, p. 8.) His several strokes prior to the execution of his wills had resulted in paralytic physical limitations and speech limitations, although he was able to get about and to a considerable degree at least, to attend to his affairs. An expert witness in the medical fields of neurology and psychiatry testified that he suffered permanent brain damage from each of the strokes and that arteriosclerosis, a progressive disease, would have been observable in him from three to six years prior to the first stroke. There was evidence that at the time he executed his will he was, in the opinion of expert witnesses testifying mainly in response to hypothetical questions, suffering from certain delusions described by the expert. And there was expert and lay testimony that he was of unsound mind. There was testimony that he became weakened to the point where he was a person who could be easily

influenced. There was proof also that his wife Beatrice sustained toward him a confidential relationship of such nature as to make her a fiduciary in respect to the issue of undue influence. We think it unnecessary to relate further details concerning the evidence on the issue of undue influence, because we think that, assuming that all the factors to be considered in resolving the issue of undue influence were present and proved save one, the failure to prove that one requires an affirmance of the court's action in refusing to submit to the jury the issue of undue influence. ■ Influence to be undue so as to justify the voidance of a will must be such as in effect to destroy the testator's free agency and substitute for his own another person's will. ■ It must be shown that pressure was brought to bear directly on the testamentary act. The influence must be shown to have been directed to procuring the will and must have amounted to coercion, destroying free agency on the part of the testator. Proof of general influence alone is insufficient. ■ Proof of opportunity to influence the making of the will, even coupled with an interest or motive to do so, is insufficient. (*Estate of Arnold*, 16 Cal.2d 573, 577 [107 P.2d 25].) ■ It was said in that case : " 'The unbroken rule in this state is that courts must refuse to set aside the solemnly executed will of a deceased person upon the ground of undue influence unless there be proof of "a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made." ' " (See also *Estate of Lingenfelter*, 38 Cal.2d 571 [241 P.2d 990], and *Estate of Goddard*, 164 Cal.App.2d 152 [330 P.2d 399].) ■ A will cannot be overturned on the mere speculation or suspicion that undue influence may have been used to procure it. (*Estate of Gleason*, 164 Cal. 756, 765 [130 P. 872] ; *Estate of Welch*, 43 Cal.2d 173 [272 P.2d 512].) Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough ; it must be influence used directly to procure the will, must amount to coercion destroying free agency. (*Estate of Welch, supra*, p. 175.) ■ "It is not sufficient for a contestant to merely prove circumstances consistent with the exercise of undue influence ; but before the will can be overthrown the circumstances must be *inconsistent* with voluntary action on the part of the testator." (*Estate of Welch, supra*, p. 178.) ■ Although such procurement can be proved by circumstantial evidence, nevertheless the proof must be made ; and disregarding testimony of proponent as to her nonparticipa-

tion does not amount to proof to the contrary. It is in the essential necessity of such proof that contestants failed to make a case warranting submission of the issue to a jury. Notwithstanding confidential relationship, motive, opportunity and perhaps an unnatural quality of the will, there was a complete lack of proof of procurement. All that was shown was that respondent, who for so long had been the testator's chauffeur, and, according to the proof made by contestants themselves, had driven him wherever he wanted to go, performed her duty as chauffeur by driving him to the office of the attorney. These facts do not warrant an inference that she was thereby wrongfully participating in the drawing and execution of his will. It cannot be inferred that she selected the attorney, since there is no direct proof of it and the proof of the contestants was that the attorney had acted for him in various matters for years, besides being an old acquaintance. There was no proof that she took part in discussing the contents of the proposed will. Indeed, the proof was that the testator simply told the attorney he wanted a will drawn leaving everything to his wife and this simple request was complied with. The attorney asked no questions and gave no advice. So far as the record shows, the only discussion that occurred, if it can be called such, was the directive issued by the testator. Respondent's presence in the attorney's office does not show wrongful participation. (*Estate of Morcel,* 162 Cal. 188, 197 [121 P. 733] ; *Estate of Easton,* 140 Cal.App. 367, 376 [35 P.2d 614]. See also *Estate of Lingenfelter, supra.*) Undue influence is not shown by the circumstance that after the testator had executed his will respondent had the attorney draw the will for her, leaving her property to her husband. It is argued by appellants that this was a situation from which it could be inferred that there was some form of mutuality or reciprocity involved connecting the two wills, thus indicating and warranting an inference of participation, but there is nothing from which this can be concluded. There was no proof whatever that the wills had been agreed upon and were reciprocal or mutual wills based upon antecedent contracts to make and keep in force such wills. The argument advanced on this point is mere speculation. In thus discussing the execution of the will of December 10, 1953, we are not losing sight of the fact that it was not this will which was offered for probate, nor do we find it necessary to analyze the appellants' argument that proof of undue influence in the execution of the first will would justify an inference that the undue influence persisted and

produced the second will. Assuming that such an argument might be made and passing on to the execution of the last will, we find the same lack of proof of active participation noted in respect of the prior will. The only difference is, if there be a difference, that when the last will was executed the proponent drove the testator to the office of the attorney and remained outside while the last will was being drawn and executed. We hold that neither will was shown to have been the product of the undue influence of respondent.

Contestants contend that it was error for the court to have refused to give their proposed instruction Number 28, which reads: "If you find that the testator, . . . , prior to the date of making the will, suffered from some form of mental disorder which would deprive him of testamentary capacity, and this disorder is shown to be of a permanent type, a presumption arises that such incapacity continued down to and including the time of making the will. Thus, if in this action you should find that the testator, . . . , did suffer from a permanent and progressive mental disease *such as senile dementia* prior to the execution of his will, then I instruct you that the law presumes, in the absence of proof to the contrary, that he remained in that condition and was thereafter incapable of making a valid will." (Italics added.) Contestants do not contend, nor does the record disclose, that there was any evidence that testator suffered from senile dementia rendering him incapable of making a will, nor is there testimony which likens or compares testator's mental condition to such senile dementia. There was testimony, as we have said, by lay witnesses that the testator was of unsound mind from a time prior to the execution of the will and expert testimony that the strokes inflicted permanent brain damage and that testator suffered from delusions which were permanent in nature. In the absence of any evidence relative to incapacitating senile dementia, the instruction as propounded by contestants would have confused the jury. Testator was 78 years old when the will was executed, had suffered a number of strokes and was somewhat crippled physically. There was testimony that he suffered from arteriosclerosis to some degree. In view of such evidence the jury might well have concluded from the reference to senile dementia that the court was telling them he did suffer from that disease to an incapacitating degree. The reference to senile dementia had no proper place in the instruction which was complete without it and, without it, would have been a

correct instruction. We hold the court was justified in refusing to give the instruction in the form requested. Where instructions are offered which cannot properly be given without modification the court may refuse to give them. (*Estate of Dopkins*, 34 Cal.2d 568, 575 [212 P.2d 886].)

 Contestants next contend that the court erred in refusing to give their proposed instruction Number 23, which reads: "The proof of the soundness of mind of the testator, . . . , and of the fact upon which his state of mind depends, are not necessarily confined to the exact time of the execution of the will. Evidence of the testator's mental status, together with his appearance, conduct, acts, habits and conversation, both before and after execution of the will, should be considered by you upon the issue of his soundness of mind so long as they have a reasonable tendency to indicate his mental condition at the time of the execution of the will." This would have been a proper instruction, but the court did give instructions upon the same subject matter, which we hold to be sufficient. The court told the jury: "In determining the mental capacity of Lloyd M. Robbins to make a Will it is proper to give consideration to his appearance, conduct, declarations, habits and conversations before and after the alleged execution of the Will, so long as such considerations have a reasonable tendency to establish the mental condition of Lloyd M. Robbins at the time of the alleged execution of the Will." The court further told the jury: "You are further instructed that evidence of the condition of the Testator's mind, both before and after the date of the Will's execution shall only be considered by you for whatever weight you see fit to give the same guided by my instructions only as it bears on the mental condition of the Testator at the very time of the Will's execution." In combination these instructions covered the matters involved in the refused instruction.

 It is contended that the court committed prejudicial misconduct by making certain comments before the jury in ruling on the admissibility of a hypothetical question. Contestants had propounded a hypothetical question which covers some 70 pages of transcript. Objection to the form of the question was sustained and contestants agreed to reframe the question. The amended question was asked the following day and objection was again made. It was not requested that the jury be excluded during arguments on the objection. Following argument, the court stated: "Well, frankly, gentle-

men, I am not too well satisfied with the propriety or the entire legality of that question, but I have in mind the rules applicable to hypothetical questions, and I am going to overrule the objection. You may answer the question.'' Before the question was answered, however, the court recessed and upon reconvening said: ''As I remember, what the Court said was that—what I said was that I had grave doubts as to the propriety and legality of the propounded question. What I intended to say was—and what I do now say by way of amendment thereto is—that I have grave doubt as to the propriety and legality of the question in part, but I have in mind the wide discretion that the Court is vested with in these matters, and at this time I am going to resolve that doubt in favor of the propounder of the question and in favor of the question. I am going to and I do overrule the objection. Doctor, you may resume the stand and answer the question.'' No objection was made by contestants at that time to the remarks of the court and the court was not requested to admonish the jury in any manner. Now contestants argue that they were entitled to the jury's unbiased consideration of the testimony of the expert witness, free from judicial remarks against it. Contestants cite *Estate of Blake*, 136 Cal. 306 [68 P. 827, 89 Am.St.Rep. 135]. That case, however, was different from this. Here the court commented to counsel upon the propriety of the question rather than on the merits of the answer. We find no misconduct and if there were any the objection would not be available on appeal, in the absence of objections made to the trial court with request for appropriate admonitions to the jury. (*Estate of McGivern*, 74 Cal.App.2d 150, 157 [168 P.2d 232].)

Finally, contestants contend that the court erred in giving a portion of proponents' instruction Number 26, reading as follows: ''The expression 'natural objects of a testator's bounty' has reference to the descendants, surviving spouse, and parents of the Testator who purely by reason of relationship may be presumed to have had claims upon his bounty. Collateral heirs such as brothers and sisters, nieces and nephews are not because of such relationship alone, 'natural objects of bounty' and such next of kin not provided for in the Will, in order to establish that the instrument is unnatural, must show affirmatively, that he had peculiar or superior claims to the decedent's bounty, and if no such claim is established the instrument cannot be held to be unnatural.''

Contestants were relying upon alleged unnatural aspects of the testator's will as part of their proof of undue influence. They proved the large extent of the testator's fortune, the short space of time that separated the marriage from the execution of the first will, the disparity between the amount carried by the will of respondent when compared with the large fortune disposed of by the testator's will. They introduced a great deal of evidence concerning friendly relations between the testator's collateral heirs and the testator. The contestants themselves requested, and the court gave, instructions defining that unsoundness of mind which will render a testator incompetent to make a will, which instructions contained a requirement that the testator be "capable of understanding the act he is doing and the relation in which he stands to the objects of his bounty."

It was proper for the court to define the term "natural objects of a testator's bounty." The definition is in accord with that contained in *Estate of Arnold,* 16 Cal.2d 573, 588 [107 P.2d 25] ; *Estate of Del Fosse,* 67 Cal.App.2d 490, 498 [154 P.2d 734] ; 26 California Jurisprudence, section 53, pages 695-696.

The judgment is affirmed.

Schottky, J., concurred.

A petition for a rehearing was denied August 26, 1959, and appellants' petition for a hearing by the Supreme Court was denied September 22, 1959.