[S. F. No. 9654. In Bank.—April 4, 1923.]

## In the Matter of the Estate of MARY E. NEWHALL, Sometimes Known as M. E. NEWHALL, Deceased.

[1] ESTATES OF DECEASED PERSONS—WILL CONTEST—EXECUTION OF HOLOGRAPHIC WILL—CONFLICTING EVIDENCE—APPEAL.—In a will contest, a verdict finding the will to have been entirely written, dated, and signed in the handwriting of the testatrix will not be disturbed on appeal, where there is a substantial conflict in the evidence on this ground of contest.

[2] ID.—UNSOUNDNESS OF MIND—INSUFFICIENCY OF EVIDENCE—NONSUIT.—In this will contest, upon the ground, among others, of unsoundness of mind of the deceased, it is held that the evidence was not sufficient to warrant the inference that the deceased was not of sound mind at the time of the making of the will, and, therefore, a motion for nonsuit was properly granted as far as this ground was concerned.

[3] ID.—UNDUE INFLUENCE—INSUFFICIENCY OF EVIDENCE.—The evidence in this case is held not sufficient to warrant and support the inference that the testatrix was induced to make the will in question as the result of the undue influence of the chief beneficiaries named therein.

[4] ID.—DEFINITION OF UNDUE INFLUENCE.—Undue influence is defined to be the exercise of acts or conduct by one person toward another person by means of which the mind of the latter is subjected to the will of the person seeking to control it.

[5] ID.—MEANS AND METHODS OF UNDUE INFLUENCE.—As applied to a ground of contest of the will of a decedent, undue influence has reference to the means and methods resorted to and employed by a person for the purpose of affecting and overcoming, and which ultimately do affect and overcome, the free and unrestrained will of the testator.

[6] ID.—UNDUE INFLUENCE — FRAUDS — DISTINCT GROUNDS OF CONTEST.—Undue influence and fraud as a ground of contest are not, as a matter of law, identical. Theoretically they constitute two separate and distinct grounds of contest.

[7] ID.—DECEPTION.—In cases where fraud alone is relied upon as a ground of contest it is the theory of the law that the testator, even though acting, in a manner of speaking, of his

---

3. Effect of unnatural testamentary disposition on question of undue influence, notes, 7 Ann. Cas. 894; 6 L. R. A. (N. S.) 202; 22 L. R. A. (N. S.) 1024.

6. Undue influence as related to fraud, note, 18 Ann. Cas. 412.

own free will, was, nevertheless, deceived by false data into doing that which he would not have done had he not been fraudulently imposed upon.

[8] ID.—FALSE REPRESENTATIONS — EFFECT OF. — It is the general rule that for false and fraudulent representations to enter as an element into undue influence it is necessary that the misrepresentations be shown to have been intermingled with or made the basis of importunities and mental pressure upon the testator. On the other hand, such false representations, even in the absence of proof that they were used as pressure upon the mind of the testator, have been held to constitute fraud if it can be shown that they were designed to and did deceive the testator into making a will different in its terms from that which he would have made had he not been misled.

[9] ID.—INTENT. — The same conditions must exist for the creation and consummation of a fraud in the procurement of a will as must be shown in cases where fraud is relied upon to vitiate an ordinary contract. One of the necessary elements is an intent to deceive the decedent or an intent to induce decedent to execute his will.

[10] ID.—SUFFICIENCY OF EVIDENCE.—It is held in this will contest that, while the evidence was not sufficient to support the inference of undue influence, there was sufficient evidence to warrant and require the submission to the jury of the issue presented by the pleadings as to whether or not the testatrix was fraudulently induced and impelled practically to disinherit the contestant by reason of false statements made to the testatrix by the two contestees concerning the character and conduct of the contestant.

[11] ID. — MOTION FOR NONSUIT — CONSIDERATION OF EVIDENCE. — It is the general rule that ordinarily upon a motion for a nonsuit, in civil cases generally, every inference favorable to plaintiff's case deducible from the evidence and every favorable presumption resulting fairly from the evidence must be taken in favor of plaintiff's case. This rule applies with equal force to cases of contests of wills. If the evidence is fairly susceptible of two constructions, or if several inferences may reasonably be made from the evidence as a whole, the view most favorable to the contest must be taken; and further, all of the evidence in favor of the contestant must, as against a motion for a nonsuit, be taken as true, and contradictory evidence, if any, must be disregarded. This having been done, if there is any substantial evidence tending to prove the fact necessary to make out the contestant's case, the motion for a nonsuit must be denied and the case given to the jury.

[12] ID. — FALSE REPRESENTATIONS — EFFECT ON TESTATOR — QUES-
TION OF FACT.—Ordinarily, in any given case the question of
whether or not false and fraudulent statements operated upon
the mind of the testator in the execution of the will is pri-
marily a question for the jury.

[13] ID.—EVIDENCE—INFERENCES.—Legitimate and reasonable- in
ferences may be drawn from every fact proved and any in-
ference fairly deducible from the evidence is as much proved for
the purpose of making out a *prima facie* case as if it had
been directly proved. The contestant is not confined to the
bare facts but is entitled to the benefit of all inferences
which may legitimately be drawn from the facts established.

[14] ID.—TIME OF FRAUD—PERSISTENCE OF BELIEF—EVIDENCE.—In a
case of fraud, it is not necessary that there should be evi-
dence that the fraud relied upon was practiced at the very
time of the making of the will. If the belief in the fraud
previously practiced, even though occurring long prior thereto,
persisted at the time of the execution of the will so that but
for the persistence of such belief the will would have been
different from that actually executed, the fraud vitiates the
will. If the testator at the time of the making of the will
no longer believed the false representations, there is no ques-
tion of fraud. Whether or not the belief persisted is provable
not only by direct evidence if available but also by circum-
stantial evidence.

APPEAL from an order of the Superior Court of
Fresno County admitting a will to probate. H. Z. Austin,
Judge. Reversed.

The facts are stated in the opinion of the court.

H. A. Blanchard for Appellant.

S. L. Strother, Everts & Ewing, Gallaher, Simpson &
Hays and A. M. Drew for Respondents.

LENNON, J.—This is an appeal taken by contestant from
an order admitting to probate the will of Mary E. Newhall,
deceased. The will, holographic in form, was attacked upon
four grounds, viz.: (1) That it was not entirely written,
dated, and signed by the testatrix; (2) that the testatrix at
the time of the execution thereof was of unsound mind;
(3) that the will was procured by the undue influence of
two of the contestees, the younger daughters of the testa-

trix and the principal beneficiaries under the will, and (4) that the will was procured by false and fraudulent representations made to the testatrix by such beneficiaries.

The case was tried with a jury. After the presentation of contestant's case a nonsuit was granted upon the last three grounds of contest, which were accordingly withdrawn from the jury's consideration and the trial thereupon proceeded upon the first ground of contest and ultimately resulted in a finding in favor of the validity of the will.

It is at once apparent from a superficial examination of the will that certain words had been changed by writing over the original words and that certain interlineations had been made therein. These changes and alterations did not, however, change the sense or meaning of the will. For instance, the date which, according to the testimony of two handwriting experts, had originally been written "August twenty fourth Nineteen hundred and Nineteen" had been changed to "Nineteen hundred and Eighteen." This was done by changing the letter "N" of the word "Nineteen" as used the second time in the original writing of the date to an "E," and in the same writing and the same word the letter "n" into the letter "g" and also the letter "e" into the letter "h." There is the testimony of a handwriting expert called by the contestant to the effect that the changes and alterations in question were made by Belle McKiernan, daughter of the testatrix. There is also testimony to the contrary by a handwriting expert, testifying for contestees, to the effect that the said alterations and interlineations were in the handwriting of the testatrix and had been made by her while the ink was still wet and before the body of the will was signed by the testatrix. There is also the testimony of Belle McKiernan that she had made no changes in the will. [1] It will thus be seen that we have a substantial conflict in the evidence bearing upon that phase of the case which concerns the first ground of contest and that in that conflict there is to be found evidence which will suffice to support the verdict finding the will to have been entirely written, dated, and signed in the handwriting of the testatrix. And, of course, in keeping with the familiar rule concerning the conflict of evidence the judgment in that behalf cannot be disturbed upon appeal.

There was some evidence offered and received for the purpose of showing that at the time of the execution of the will the testatrix was of unsound mind. A fair sample of the evidence adduced in this behalf is to be found in the testimony of witnesses to the effect that the testatrix on one occasion when two of her daughters were engaged in a heated altercation threw up her hands and declared that she "would go crazy," and that on another occasion she appeared at the pump-house on her ranch in Tulare County in very scant attire. [2] Upon the whole the evidence adduced in support of this phase of the case was not in our judgment sufficient to warrant the inference that the deceased was not of sound mind at the time of the making of the will and, therefore, the motion for a nonsuit in so far as it was grounded upon the alleged unsoundness of mind of the testatrix was properly granted.

The facts of the contestant's case bearing upon the issues of fraud and undue influence substantially stated are these:

The decedent died in Fresno January 15, 1920, at about the age of eighty years. She had been twice married and left as her heirs four daughters, Grace A. Ryder, contestant herein, and Bessie Hawley, children of her first marriage, and Georgie Dunn and Belle McKiernan, children of her second marriage. A son, Carl Newhall, had predeceased her in August, 1911.

By the terms of the will made by decedent about two years prior to her death, the contestant, Grace Ryder, was left the sum of five dollars. Bessie Hawley and her daughter, Marion Hawley Martin, were left all of the real property of deceased in Santa Clara County, in Capitola, Santa Cruz County, and in Monterey County. The residue of the property was left to the two younger daughters, Belle McKiernan and Georgie Dunn, in equal shares. The entire estate was valued at about $175,000. Due to the fact that after the making of the will and before her death the decedent had sold the most valuable portion of her estate in Santa Clara County and also the house and furniture at Carmel in the county of Monterey, the estate left to Bessie Hawley was materially diminished and as a consequence the two younger daughters take, by the terms of the will, the bulk of the estate. A part of the residue consisted of a

valuable orange grove near Exeter, Tulare County, California, valued at $90,000.

The testatrix had, at one time, lived with her first husband near San Jose. Her two older daughters, Bessie Hawley and Grace Ryder, both of whom had married, continued to reside in that part of the state. The mother subsequently moved to Fresno County, where the two younger daughters, Georgie Dunn and Belle McKiernan, although married, lived much of the time with her. Her son Carl Newhall, to whom she had given a parcel of real estate in Santa Clara Valley, continued to live near contestant. There had always been more or less friction between the children of the two marriages, but prior to 1911 there are no indications that it influenced the mother. Many circumstances, including letters written to contestant and to Marion Hawley, daughter of Bessie Hawley, at that time show a friendly relation existing between the mother and her two older daughters.

In 1911 a proceeding was instituted by Bessie Hawley in the superior court of Fresno County for the appointment of a guardian for Mrs. Newhall upon the ground, as alleged in her petition, that Mrs. Newhall was incompetent to manage and take care of her property. This, of course, aroused the resentment of Mrs. Newhall toward Bessie Hawley. And in a will made in April of that year Mrs. Newhall left to Bessie Hawley only the house in Capitola. The testatrix at this time was, however, friendly with Mrs. Ryder and provided in the same will that all of the property with the exception of the house in Capitola should be divided equally among the remaining four children, Grace Ryder, Georgie Dunn, Belle McKiernan, and Carl Newhall. In a letter written to Grace Ryder about the 1st of July, 1911, Mrs. Newhall said that she expected Mrs. Ryder to help her in the guardianship proceedings.

Mrs. Ryder came to Exeter in July to consult with her mother in regard to the guardianship matter, bringing her attorney with her. It was at this time that several of the statements claimed by contestant to be false and to have influenced the mother in the making of the will were made by her two half-sisters. One of the statements made by Mrs. McKiernan was that Mrs. Ryder was the real instigator of the guardianship proceedings; that Mrs. Ryder was responsible for the whole affair and that she only cared for

her mother for what she could get out of her and that she was after her property. Mrs. Newhall believed this statement. She told a Mr. Dreisbach, the foreman of her ranch, "more than once," that although Mrs. Hawley had actually instituted the proceeding to have her declared incompetent, still no one could make her believe that Mrs. Ryder had not instigated those proceedings. It was on this same visit that Mrs. McKiernan told her mother that Mrs. Ryder was an immoral woman; that she was no good, and that she was not decent. The falsity of these statements, as pleaded by contestant, are admitted by a failure of contestees to deny their falsity in any of their pleadings. The denials in this behalf are limited to a denial of the mere making of the statements. There was direct testimony to the effect that the statements in question were false.

In August, 1911, Carl Newhall died and it was found that he had by will devised and bequeathed all of his property, including the real estate which had been originally given to him in Santa Clara Valley, to his half-sister, Grace Ryder, This greatly offended the testatrix, who had evidently expected to receive the property back in the event of her son's death. She instituted a contest of his will in the superior court of Santa Clara County, claiming that Grace Ryder had procured the making of this will by her half-brother by persistent importunities and threats. During the course of the trial, at which Mrs. Newhall was present attended by her two younger daughters, Georgie Dunn and Belle McKiernan, many charges against the character of Mrs. Ryder were publicly made and attempted to be proved. The jury, however, found against Mrs. Newhall, contestant therein, and brought in a verdict in favor of the validity of the will. From that time the relations between Mrs. Newhall and Mrs. Ryder were strained and Mrs. Ryder never thereafter saw her mother to talk to her.

On November 11, 1911, after Carl's death, Mrs. Newhall executed a new will revoking all former wills and leaving all of her property, with the exception of the house in Capitola which she left to Bessie Hawley, to her two younger daughters, Georgie Dunn and Belle McKiernan, share and share alike.

In the fall of 1911 or the spring of 1912, Mr. Mackey, a constable, drove Mrs. Hawley and her daughter, Marion,

out to the ranch. Before he left town Mrs. McKiernan called him up on the phone and told him that if her sister wanted to come out to dissuade her from doing so, that she did not want her there and that she would not have her there. When Mrs. Hawley arrived at the ranch Mrs. McKiernan would not allow her and her daughter to come in, notwithstanding the fact that it was a cold, foggy night, and the further fact that Mrs. Hawley's daughter, Marion, who accompanied her, was ill. Mr. Mackey went into the house and found there Mrs. Newhall, Mrs. McKiernan, and a man by the name of Poe. Beside the door was a rifle, and when he asked Mrs. McKiernan what it was for she replied, "I intended to use it if she forced her way in." The testimony of Mr. Mackey, although denied by Mrs. McKiernan on the witness-stand, was corroborated by the testimony of Mr. Poe, who also testified that he had heard Mrs. McKiernan say that if Mrs. Ryder bothered her "she had a gun."

In 1912 Mrs. Ryder went out to the ranch to see her mother. Her two younger sisters were there but refused to call their mother, who was out in the orchard, and one of them carried her lunch to her mother so that it would not be necessary for her to come in while Mrs. Ryder was there.

In 1919 Mrs. Ryder wrote to her mother suggesting that she would like to come to Exeter to visit her. She received a letter from her mother forbidding her to come and saying, "I should think you would be ashamed to come to me with your trouble after the shameful way you have been living. Don't for one minute think I don't know how you have been conducting yourself."

There was some evidence that the will in controversy was drafted and signed by Mrs. Newhall while alone on her ranch with her daughter, Belle McKiernan. Thus the testimony of both handwriting experts was to the effect that the will had originally been dated, "Exeter, California, August twenty-fourth Nineteen Hundred and Nineteen," and subsequently altered to "August twenty-fourth Nineteen Hundred and Eighteen." And the testimony of the ranch foreman was to the effect that the only time that Mrs. Newhall was out at the ranch at Exeter after April, 1919, was one Sunday in the summer of 1919 when she came out with her daughter, Belle McKiernan, and a Mr. Sparkman, who

was named as executor of this will.  Mr. Sparkman remained
with the testatrix but a short time, but Mrs. Newhall re-
mained until the next day at the ranch with her daughter,
Belle McKiernan.  Judge Church, as a witness for the con-
testant, testified that prior to 1919 Mrs. Newhall did not
know that a will could be made holographic in form.  All
of her previous wills had been attested wills.  Some time
in the early part of 1919 Judge Church explained to her
the requisites of a holographic will.  There is also testi-
mony that in February, 1919, she was worried about two
previous wills which were in the custody of Mr. Cook, an
attorney at Fresno, notwithstanding the fact that there
would have been no reason for her worry had the will in
controversy been already executed inasmuch as it expressly
revoked all wills formerly executed.

[3]  The evidence above narrated will not suffice, in our
opinion, to warrant and support the inference that the
testatrix was induced to make the will in question as the
result of the undue influence of the chief beneficiaries named
therein.  [4]  Undue influence is defined to be the exercise
of acts or conduct by one person toward another person by
means of which the mind of the latter is subjugated to the
will of the person seeking to control it.  [5]  As applied to
a ground of contest of the will of a decedent undue influence
has reference to the means and methods resorted to and em-
ployed by a person for the purpose of affecting and over-
coming and which ultimately do affect and overcome the
free and unrestrained will of a testator.  (*Estate of Snow-
ball*, 157 Cal. 301 [107 Pac. 598] ; *Estate of Ricks*, 160 Cal.
467 [117 Pac. 539].)  As we read and understand the evi-
dence relating to the issue of undue influence it does no
more than show that the two younger sisters had the op-
portunity to make, and did make, ·to their mother, the
testatrix, false, derogatory, and defamatory statements con-
cerning the contestant.  But there is no showing in addition
that the mind of the testatrix, at the time of the making of
the will, was subjugated to and dominated by the desires and
designs of the contestees to the point of undue influence.
That is to say, there is no showing of any restraint by the
two contestees upon the mind of the testatrix, which re-
sulted in making the will, as executed, represent the wishes

of the contestees, who were the principal beneficiaries, rather than the wish and will of the testatrix.

Undue influence is not always the equivalent of fraud. One may exist without the presence of the other. The former, however, may, at times, be exerted and applied through the medium of fraud. Oftentimes the terms "undue influence" and "fraud" are used interchangeably. Thus it has been held that undue influence, even though exercised without the aid of actual fraud or fraudulent representations, is a form of fraud. (*Estate of Ricks, supra.*) It has also been held that undue influence may be exerted no less by fraudulent misrepresentations than by means of duress or other pressure. (*Estate of Snowball, supra.*) [6] Undue influence and fraud as a ground of contest are not, as a matter of law, identical. Theoretically they constitute two separate and distinct grounds of contest. [7] In cases where fraud alone is relied upon as a ground of contest it is the theory of the law that the testator, even though acting, in a manner of speaking, of his own free will, was, nevertheless, deceived by false data into doing that which he would not have done had he not been fraudulently imposed upon.

[8] It is the general rule that for false and fraudulent representations to enter as an element into undue influence it is necessary that the misrepresentations be shown to have been intermingled with or made the basis of importunities and mental pressure upon the testator. On the other hand, such false representations, even in the absence of proof that they were used as pressure upon the mind of the testator, have been held to constitute fraud if it can be shown that they were designed to and did deceive the testator into making a will different in its terms from that which he would have made had he not been misled. (*Estate of Benton,* 131 Cal. 472, 478 [63 Pac. 775].)

There is some language in the *Estate of Ricks, supra,* which, when segregated from the text of the opinion, seemingly states the rule in effect to be that such false representations may be relied upon as a ground of contest even though they may not have been made with the intent and purpose of affecting a testamentary disposition. That language is not to be taken as a correct statement of the rule. The question of the procurement by fraud of a will was not in-

volved in that case. The issue presented there was solely one
of undue influence and the court in employing the language
referred to did so merely by way of discussion and for the
purpose of emphasizing the distinguishing features which
are recognized as existing between undue influence and the
inducements of false representations. **[9]** Obviously the
same conditions must exist for the creation ond consumma-
tion of a fraud in the procurement of a will as must be
shown in cases where fraud is relied upon to vitiate an
ordinary contract. (*Estate of Kohler,* 79 Cal. 313 [21 Pac.
758].) One of the necessary elements is an intent to de-
ceive the decedent or an intent to induce decedent to
execute his will. (*Estate of Benton, supra.*)

**[10]** While the evidence was not sufficient to support
the inference of undue influence as above defined there was,
however, in our opinion, sufficient evidence to warrant and
require the submission to the jury of the issue presented
by the pleadings as to whether or not the testatrix was
fraudulently induced and impelled practically to disinherit
her daughter, the contestant herein, by reason of the false
statements made to the testatrix by the two contestees con-
cerning the character and conduct of the contestant.

**[11]** It is, of course, the general and well-understood
rule that ordinarily upon a motion for a nonsuit, in civil
cases generally, every inference favorable to plaintiff's case
deducible from the evidence and every favorable presumption
resulting fairly from the evidence must be taken in favor
of plaintiff's case. This rule applies with equal force to
cases of contests of wills. Of course, if the evidence is
fairly susceptible of two constructions, or if several infer-
ences may reasonably be made from the evidence as a whole,
it goes without saying that the view most favorable to the
contestant must be taken. And further, all of the evidence
in favor of the contestant must, as against a motion for a
nonsuit, be taken as true, and contradictory evidence, if any,
must be disregarded. This having been done, if there is any
substantial evidence tending to prove the fact necessary to
make out the contestant's case, the motion for a nonsuit
must be denied and the case given to the jury. (*Estate of
Arnold,* 147 Cal. 583 [82 Pac. 252]; *In re Ross,* 173 Cal.
178 [159 Pac. 603]; *In re Carson,* 184 Cal. 437 [17 A. L. R.

239, 194 Pac. 5] ; *Estate of Ricks,* 160 Cal. 450 [117 Pac. 532].)

From the circumstances shown in evidence it is apparent that the jury might rightfully have found that there was a constant effort on the part of the two younger sisters to prejudice and influence their mother against the two older sisters and particularly against the contestant herein. There is no question but that intense bitterness and hostility existed between contestant herein and her two younger sisters and that the latter, living as they did with their mother, had ample opportunity to discredit the older sister in the eyes of the mother. There is also direct evidence that disparaging and false statements were made to the mother concerning the contestant by the younger sisters which must, undoubtedly, have had an influence in creating and keeping alive the bitterness of the mother against the contestants.

There is no doubt but that the mother deeply resented the institution of the guardianship proceedings. If there could be any doubt of this it is dispelled by the fact that shortly after the institution of the proceedings she made a will in which she left Bessie Hawley only the house in Capitola, dividing the remainder of her estate among her other children. When, therefore, she was told that Grace Ryder was the real instigator of the guardianship proceedings the resentment which theretofore had been directed only toward Bessie Hawley was transferred to Grace Ryder. The testimony of Mr. Dreisbach, foreman of Mrs. Newhall's ranch, shows that Mrs. Newhall believed the statement that Grace Ryder was responsible for the institution of the guardianship proceedings and that this belief was persisted in by her.

It is inconceivable that the statements made to the mother that the contestant, Grace Ryder, "was an immoral woman, that she was no good, and that she was not decent" did not adversely affect the feelings of the mother toward her daughter. Indeed, that it did lessen the regard and affection of the mother for her daughter is evidenced by the letter written by the testatrix in answer to a letter from Mrs. Ryder, the contestant, suggesting that the latter visit the testatrix at Exeter, wherein the testatrix objected to the proposed visit of the contestant, basing her objection, in

effect, upon the ground that the contestant should be ashamed to come there after the shameful way in which she had been living. This letter, written, as it was, in August, 1919, also demonstrates that a belief in the disparaging statements and their damaging implications as to the character and conduct of her daughter continued and persisted in the mind of the mother.

These circumstances would have warranted a finding by the jury that the whole atmosphere surrounding the mother was poisoned with hatred, hostility, and ill will toward the two older daughters. In this atmosphere the will in contest was made practically disinheriting the contestant herein. [12] Ordinarily, in any given case the question of whether or not false and fraudulent statements operated upon the mind of the testatrix in the execution of the will is primarily a question for the jury.

If, from the evidence offered in support of contestant's case, the inference can fairly be drawn that the intent behind the making of the false representations was to influence the execution of the will, and that the will was a result of such false representations, and but for such representations would not have been so drafted, then the *prima facie* case necessary to take the case to the jury has been established. From the very nature of the inquiry the proof must necessarily be largely or wholly circumstantial. The contestant is not required to prove every fact and every conclusion of fact upon which the issue depends. [13] Legitimate and reasonable inferences may be drawn from every fact proved and any inference fairly deducible from the evidence is as much proved for the purpose of making out a *prima facie* case as if it had been directly proved. The contestant is not confined to the bare facts but is entitled to the benefit of all inferences which may legitimately be drawn from the facts established.

While, of course, the statements made by the younger sisters may be explainable solely upon the hypothesis of their animosity and hatred toward their older sister, yet the undisputed existence of this very hostility furnishes ground for the inference that the intention of the sisters was that, by reason of the statements and the belief engendered in the mother's mind therefrom, their mother should execute

190 Cal.—46

a will benefiting them and at the same time injuring their sister.

The successful efforts of the two younger sisters to prevent the other sisters from seeing their mother may well have been with the purpose of thwarting any attempt on the part of the older sisters to refute the charges and accusations made against them and to prevent a reconciliation being effected between the sisters and their mother. These efforts would have a tendency to show an endeavor on the part of the two younger sisters to perpetuate the estrangement and to show the intent with which it was done. They would also have the tendency to show that the will was the result of the false representations made by showing that after the representations were made no opportunity was afforded contestant to demonstrate their falsity.

[14] This being a question of fraud, it is not necessary that there should be evidence that the fraud relied upon was practiced at the very time of the making of the will. If the belief in the fraud previously practiced, even though occurring long prior thereto, persisted at the time of the execution of the will so that but for the persistence of such belief the will would have been different from that actually executed, the fraud vitiates the will. (*Estate of Benton,* 131 Cal. 472, 479 [63 Pac. 775].) Of course, if the testatrix at the time of the making of the will no longer believed the false representations, there is no question of fraud. Whether or not the belief persisted is provable not only by direct evidence if available but also by circumstantial evidence. Although in the instant case the direct testimony is to the effect that the false statements of which contestant is cognizant were made some time in 1911 and 1912, and the will was not made until 1918 or 1919, there is the testimony of Mr. Dreisbach, who became Mrs. Newhall's foreman in 1917, that he had heard her say that Mrs. Ryder was responsible for the institution of the guardianship proceedings; that nothing would ever make her believe differently, and that she had said this more than once. Certainly this is evidence that the belief of testatrix in the accusation that Mrs. Ryder was the real instigator of the proceedings persisted long after they were made. There is also in the letter written by Mrs. Newhall to Mrs. Ryder on August 18, 1919, evidence that the mother still entertained the belief that

ʹthe conduct of her daughter was questionable. This is sufficient, we think, to support the inference that the belief continuing for such a length of time still persisted in the mind of the testatrix at the time of the making of her will.

It is possible that upon the trial of the case the jury may find that it was the bitterness engendered by the contest of the will of Carl Newhall which was the cause for the disinheritance of her daughter by the testatrix and that it was the mother who took the initiative against the contestant. On the other hand, taking as true, as we must, the evidence in the light most favorable to contestant, there is evidence to support the conclusion that the disinheritance was the result of false and fraudulent representations made by the two younger sisters concerning contestant. It was, therefore, for the jury to say whether the contest of Carl's will caused the disinheritance of the contestant or whether it was due primarily to the representations which, it was claimed, were fraudulently made concerning the contestant. It follows that the motion for a nonsuit in so far as ·it related to the issue of fraud should have been denied.

Judgment reversed and cause remanded for a new trial.

Seawell, J., Myers, J., Lawlor, J., and Wilbur, C. J., concurred.