67 Cal.2d 609 (1967)
Estate of AUGUSTA C. CALLAHAN, Deceased. HARRIETT A. FINLEY et al., Plaintiffs and Appellants,
v.
MARGARET C. YOUNG, as Executrix, etc., et al., Defendants and Respondents.
L. A. No. 29255. 
Supreme Court of California. In Bank. 
Nov. 7, 1967.
 Floyd H. King and Julius W. Feldman for Plaintiffs and Appellants.
 Charles D. Swanner and John Neil Stanley for Defendants and Respondents.
 SULLIVAN, J.
 On January 18, 1963, a holographic instrument dated July 7, 1950, was admitted to probate as the last will of Augusta C. Callahan. Within six months after probate (see Prob. Code, 380) Harriett A. Finley and Josie M. Hennenberg [fn. 1] filed their contest of the will on the grounds of lack of testamentary capacity; undue influence and fraud exercised by Margaret C. Young, decedent's niece, guardian, principal beneficiary and one of the proponents of her will; and lack of due execution of said document. The last ground of contest was presented to the court as a separate issue, decision of other issues to be reserved pending its determination. On July 20, 1964, the court revoked probate of the will, finding lack of due execution, and the proponents appealed. In Estate of Callahan (1965) 237 Cal.App.2d 818 [47 Cal.Rptr. 220], it was held that the will was legally sufficient in its execution, form, and content to constitute a will, and the order of the superior court revoking probate was accordingly reversed, with direction to try the other issues involved in the *612 contest. Upon the ensuing retrial, a judgment of nonsuit was entered at the close of contestants' case, and they appeal.
 The unusual nature of decedent's holographic will was fully described in the first Callahan case (237 Cal.App.2d 818, 820-822). In general, the will consists of three strips of paper fastened together with transparent adhesive tape. The upper portion (sheet A), bears the date July 7, 1950, and declares the instrument to be the last will of decedent. This portion goes on to make certain specific gifts and provides for payment of taxes from the residue. It ends with the following incomplete sentence: "I give, devise and bequeath all of the rest, residue and remainder of my property, whatsoever and wheresoever situated." The word "situated" appears at the lower right-hand corner of sheet A, and it is apparent that that sheet was cut with a scissors from a larger sheet of which it had been a part and joined to sheet B. Sheet B reads as follows: "I will to Helen--Gorge--Willbur--Maurece--the sum of 2000.00 each. I will to Margret all my stocks and bonds to have and to hold." [fn. 2] Sheet C is attached to the bottom of sheet B, and it appoints Margaret C. Young executrix without bond and revokes all former wills. Decedent's signature appears at the bottom of sheet C.
 The sole issue in this case is whether the proponents' motion for nonsuit was properly granted. The law applicable to this inquiry was carefully stated by this court in Estate of Lances (1932) 216 Cal. 397 [14 P.2d 768]: [1] "In determining whether, in a proceeding to contest a will, the evidence produced by the contestant is sufficient to require the submission of the case to the jury, the same rules apply as in civil cases. [Citations.] ... [2] A nonsuit or a directed verdict may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' [Citations.] [3] Unless it can be said as a matter of law, that, when so considered, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon *613 appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury. [Citation.] ... [4] Although the trial court may weigh the evidence and judge of the credibility of the witnesses on a motion for a new trial, it may not do so on a motion for a directed verdict [or for nonsuit.]" (216 Cal. 397, 400-401.)
 With these principles in mind we turn to a consideration of the evidence introduced on behalf of contestants.
 Harold Ely, an expert in handwriting comparison, testified in substance that all three portions of the will (sheets A, B, and C) were written by decedent, that sheet C was written prior to sheet A, which bore the date July 7, 1950; and that sheet B was written within three months before or after an exemplar which bore the date "Jan. 1960." All of Mr. Ely's testimony as to the time at which the various portions of the will were written was admitted over objection. On cross-examination it was brought out that Mr. Ely arrived at his opinion through comparing the several portions of the will with only six exemplars of the handwriting of decedent, and that he could have expressed an opinion more precise as to time of execution if he had been provided with a greater number of exemplars representing progressive changes in decedent's handwriting.
 Dr. Charles Oliver, a physician experienced in geriatrics, testified in substance that he had treated decedent from 1951 or 1952 until she was admitted to a sanitarium in April of 1960; that in 1958 she was an elderly woman suffering from arteriosclerosis whom he considered "eccentric"; that in April of 1960 he was informed by Margaret C. Young, as well as by the manager of the apartment in which decedent lived, that decedent "apparently was disturbing some of the other occupants of the building by some of her activities, none of which were very wild, but she was apparently parading the halls and so on and was somewhat disoriented"; that as a result of these communications Dr. Oliver examined decedent and determined that her condition required that she be admitted to a sanitarium; that he diagnosed her condition at this time as "generalized arteriosclerosis with senility"; that senile dementia, the mental condition resulting from the effects of arteriosclerosis upon the cells of the brain, is a progressive condition which develops gradually over a period of years, rather than a condition which develops suddenly; that decedent was "incompetent medically" at the time of *614 her admission to the hospital [fn. 3] (April 4, 1960); that it was unlikely that decedent at that time knew the nature and extent of her property, or that she understood her relationship to persons who had claims upon her bounty, or that she would have understood the nature of her act had she executed a will; that decedent's physical condition at that time, which included hand tremors, would render unlikely her accomplishment of the physical acts necessary to tape the three portions of the will together; and that, due to the progressive nature of the disease from which decedent suffered, it was unlikely that decedent, for a period of "two or three years prior to" her admission to the hospital, knew the nature and extent of her property, or understood her relationship to persons who had claims upon her bounty, or would have understood the nature of her act had she executed a will. On cross-examination it was brought out that Dr. Oliver had not seen decedent for a period of two to three years prior to his April 1960 examination of her; that his opinion as to the progression of the disease in her particular case was a "generalized" one based on past experience of other cases; and that decedent might have had lucid moments during the period from 1959 to the date of her admission into the sanitarium.
 Lewis K. Cox, a former member of the board of management of the apartment building in which she lived, testified that he considered himself a "good friend" of decedent; that prior to 1958 she was "a brilliant woman, a good business woman"; that after 1958 she became somewhat "erratic" in her conduct, began "wandering in the halls a lot," and was unable to converse with any continuity of thought; that in 1959 she accused him of stealing from her certain securities which later were found to have been misplaced by her in her apartment; that subsequent to 1958 decedent, who was previously quite meticulous in her personal habits, began to appear with her clothes in disarray and began to let her apartment fall into disorder; and that subsequent to 1958 he observed tremors in decedent's hands and on one occasion she told him that she did not write any more because of this condition. On redirect examination Mr. Cox was permitted over objection to give his opinion that decedent, after 1958, was not "of sound mind." *615
 Dr. Hayden Rochester, staff psychiatrist at the hospital to which decedent was admitted in 1960 after Dr. Oliver's examination, testified in substance that he examined decedent shortly after her arrival; that in the course of the examination he asked decedent where she was and she replied that she was in the mountains; that he determined as a result of this examination that decedent was suffering from "moderate" senile dementia; and that, in spite of the hand tremors suffered by decedent at that time, it would have been possible for her to write something under the direction of someone else. Dr. Rochester also testified as to the progressive nature of senile dementia and his testimony on this point was substantially identical to that of Dr. Oliver. It was brought out on cross-examination that decedent could have had lucid periods before or after April 1960, but on redirect examination Dr. Rochester testified that the occurrence of such periods was unlikely within six months prior to his examination of decedent in April of 1960.
 Plaintiffs also introduced certain documentary evidence, which included (1) medical records from the Parkview Sanitarium (see fn. 3, ante), reflecting decedent's continued mental deterioration from the date of her admission (August 13, 1960) until her death on December 20, 1962; [fn. 4] and (2) the record of proceedings, initiated by Margaret C. Young on April 8, 1960, wherein decedent was declared incompetent and Mrs. Young appointed guardian of her person and estate. [fn. 5]
 [5a] In summary, the evidence produced by contestants on the issue of testamentary capacity, viewed in light most favorable to contestants, was that sheet B of the will was executed within three months before or after January of 1960, and that during the indicated period decedent suffered from senile dementia to the extent that she did not know the nature and extent of her property, did not understand her relationship to persons with claims upon her bounty, and would not have understood the nature of her act had she undertaken to execute a will.proponents argue that such evidence would be insufficient to support a jury's finding of lack of testamentary capacity, and that therefore the nonsuit was properly granted as to this ground of contest. We disagree.
 In Estate of Fosselman (1957) 48 Cal.2d 179 [308 P.2d *616 336], proponents offered for probate two alleged holographic codicils to decedent's will, one dated July 17, 1953, and the other January 12, 1955. Contestants, although they offered no evidence as to decedent's mental condition on the indicated dates, produced medical evidence to the effect that from 1952 until the date of her death decedent, due to senile dementia, was unable to comprehend the nature and extent of her property or her relation to those who would be the natural objects of her bounty. The trial court found that decedent lacked testamentary capacity at the time when each of the purported holographic codicils was executed. In a separate finding it was concluded, on the basis of other evidence that on the dates of execution decedent suffered from an insane delusion as to her relationship with proponent, and that this delusion was the effective cause of the execution of said instruments. The trial court accordingly entered judgment denying admission of the proffered documents to probate. This court affirmed the judgment, holding that there was sufficient evidence to support each of the two findings. On the ground of testamentary capacity we held that the absence of evidence showing lack of capacity on the date of execution did not require that the finding be upset. [6] "Testamentary incompetency on a given day ... may be proved by evidence of incompetency at times prior to and after the day in question. [Citations.] Once it is shown that testamentary incompetency exists and that it is caused by a mental disorder of a general and continuous nature, the inference is reasonable [citations], perhaps there is even a legal presumption [citations] that the incompetency continues to exist. Such an inference is particularly strong in a case such as this in which the decedent was suffering from senile dementia, a mental disorder that becomes progressively worse. [Citations.]" (Estate of Fosselman, supra, 48 Cal.2d 179, 185-186; see also Estate of Lauth (1960) 180 Cal.App.2d 313, 318 [4 Cal.Rptr. 764]; cf. Estate of Fritschi (1963) 60 Cal.2d 367, 369-372 [33 Cal.Rptr. 264, 384 P.2d 656].)
 [5b] Proponents attempt to distinguish the Fosselman case on the ground that there the precise date of the codicils in question was known, whereas here there was no evidence of the date upon which sheet B of decedent's will was executed. Further, there was no evidence of the date upon which this sheet was integrated into the will. It is clear, however, that the precise dates of execution and integration would be relevant in the premises only insofar as they should indicate that *617 those operative acts occurred within or without the period of alleged testamentary incapacity. In the instant case the testimony of Mr. Ely, the expert in handwriting comparison, was that such acts occurred within the indicated period. [fn. 6] If this be established, the precise dates of execution and integration are, in the circumstances of this case, irrelevant.
 [7a] It is contended, however, that the testimony of Mr. Ely purporting to fix the time of execution was erroneously admitted, over proper objection, because it lay outside the scope of his expertise. Since contestants presented no other evidence purporting to place the execution of sheet B within the critical period, it is argued, the nonsuit was properly granted as to this ground of contest. [8] This contention ignores the well-settled rule that, upon a motion for nonsuit, "Evidence, whether erroneously admitted or not, if relevant to the issues joined, must be given the credit and benefit of its full probative strength, ..." (Italics added.) (Berger v. Lane (1923) 190 Cal. 443, 452-453 [213 P. 45]; see also Gregg v. Western Pac. R.R. Co. (1924) 193 Cal. 212, 216 [223 P. 553]; Mitchell Camera Corp. v. Fox Film Corp. (1937) 8 Cal.2d 192, 197 [64 P.2d 946]; Wulfjen v. Dolton (1944) 24 Cal.2d 878, 880 [151 P.2d 840]; Van Buskirk v. McClenahan (1958) 163 Cal.App.2d 633, 636 [329 P.2d 924].) [7b] It is therefore clear that Mr. Ely's evidence as to the time of execution, which was clearly relevant to the issues joined, must be given full effect in the instant case regardless of whether or not its admission was erroneous. If the evidence was improperly admitted, and the jury in due course determines the issues of testamentary capacity adversely to proponents, their remedy lies by way of appeal.
 [5c] We have determined that the evidence introduced on the issue of testamentary capacity, viewed in the light required by our Lances and Berger decisions, was sufficient to require submission of that issue to the jury, that the nonsuit was therefore improperly granted, and that the judgment must therefore be reversed. [9] Though this conclusion renders unnecessary a consideration of contestants' additional contention that sufficient evidence of undue influence and fraud was presented to withstand a motion for nonsuit, *618 we briefly address ourselves to this issue for the guidance of the trial court upon retrial. [fn. 7]
 [10a] The evidence produced by contestants on the ground of undue influence and fraud, [fn. 8] viewed in a light most favorable to them, may be summarized as follows: Sheet B of the will, which bequeathed the bulk of decedent's property to Margaret Young, [fn. 9] was executed either during the latter's guardianship of decedent or shortly before that period. At the time of execution decedent's mind had deteriorated to such an extent that she was susceptible to influence. Only the children of decedent's deceased brother benefit by the will, and the issue of her other deceased siblings are not provided for. Further, of the nieces and nephews provided for only Margaret will take a substantial portion of the estate. In addition, though decedent could have written sheet B under the direction of someone else during the period of execution, she was incapable of physically integrating it into the will in the manner in which it was integrated. Finally, decedent's interest in her apartment, which was not disposed of in the will, was in fact sold during the period of guardianship.
 Although these facts appear sufficient to establish the presence herein of some of the indicia of undue influence (see Estate of Yale (1931) 214 Cal. 115, 122 [4 P.2d 153]; Estate of Lingenfelter (1952) 38 Cal.2d 571, 585 [241 P.2d 990]) we are satisfied that the evidence is insufficient to establish that Margaret Young was active in procuring execution of the will. [11] "Even though a beneficiary sustains a confidential relationship with the testator ... and although the will may be an 'unnatural one,' " there must be evidence that the *619 beneficiary " 'displayed activity in the preparation of the will to his undue profit. [Citing cases.]' ... In the absence of such evidence, plaintiffs weld no causal link between the ability to influence the testator arising from the confidential relationship and the unnatural document. Mere general influence is not enough. A contestant must show that the influence was brought directly to bear upon the testamentary act. (Estate of Welch, supra, (1954) 43 Cal.2d 173, 175 [272 P.2d 512]; Estate of Lingenfelter, supra, (1952) 38 Cal.2d 571.)" (Italics added.) (Estate of Fritschi, supra, 60 Cal.2d 367, 374.) [10b] The evidence above summarized does not make the required showing. [fn. 10]
 Therefore, although we recognize that upon retrial contestants may seek to set forth a prima facie case of undue influence by means of evidence additional to that introduced below, we conclude that the record before us does not contain evidence sufficient to warrant submission of the issue to the trier of fact.
 The judgment is reversed.
 Traynor, C. J., McComb, J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.
NOTES
[fn. 1] 1. Josie M. Hennenberg was a sister of decedent. During the pendency of the action she died, and her sole heir, her son Clarence Fischer, was substituted in her place as one of the contestants. Harriett A. Finley is decedent's niece, the daughter of a deceased sister.
[fn. 2] 2. Margaret, George, Wilbur, Maurice, and Helen are all children of a deceased brother of decedent. All are proponents herein.
[fn. 3] 3. Apparently decedent was in a hospital for examination and treatment from April 4, 1960, until April 18, 1960, at which time she was transferred to the Garden Grove Sanitarium. On August 13, 1960, Mrs. Callahan was transferred to the Parkview Sanitarium.
[fn. 4] 4. Decedent was approximately ninety years of age on the date of her death.
[fn. 5] 5. This record discloses that decedent's interest in her apartment was sold during the period of guardianship.
[fn. 6] 6. Execution necessarily precedes integration, for integration entails the existence of something of testamentary effect to be integrated. In the instant case, where the period of alleged testamentary incapacity extended up to time of death, the fixing of the time of execution within the period of incapacity necessarily fixes the date of integration within that period.
[fn. 7] 7. Although the "propriety of granting a motion for a nonsuit as to some of the grounds of contest and denying it as to others is doubtful when we speak of nonsuit in its true meaning," the court may properly withhold from the jury a particular ground of contest, upon which insufficient evidence has been presented, by instructing the jury to find for the proponent on that ground. (Estate of Jamison (1953) 41 Cal.2d 1, 5-6 [256 P.2d 984]; see also Estate of Lounsberry (1957) 149 Cal.App.2d 857, 858 [309 P.2d 554]; Estate of Robbins (1959) 172 Cal.App.2d 549, 551 [342 P.2d 933].)
[fn. 8] 8. Although "fraud" may be presented as a separate ground of contest (see In re Newhall (1923) 190 Cal. 709, 718 [214 P. 231, 28 A.L.R. 778]), and was so presented by the pleadings herein, no evidence of positive wrongdoing was presented, and contestants appear to have subsumed their arguments on this point into their arguments on undue influence.
[fn. 9] 9. Decedent's estate was appraised at approximately $76,500. About six-sevenths of this appraised valuation is attributable to items of which the phrase "stocks and bonds" is descriptive. Sheet B of the will bequeaths "all my stocks and bonds" to Margaret Young.
[fn. 10] 10. Contestants' reliance on Estate of Beckley (1965) 233 Cal.App.2d 341 [43 Cal.Rptr. 649], is misplaced. There was evidence in that case that the chief beneficiary of the subject will practiced misrepresentation in order that his own attorney, rather than the attorney who had drawn decedent's former wills, should draw the will. It could reasonably be inferred that this action was taken by the beneficiary so that the former attorney would be unable to dissuade decedent from executing a will consistent with a testamentary plan of whose wisdom the beneficiary-proponent, through his confidential relationship, had persuaded decedent. The instant case contains no evidence showing any specific act of Margaret Young relative to the testamentary act of decedent.