[Civ. No. 42864. First Dist., Div. Two. Dec. 21, 1978.]

Estate of ANNA DOROTHEA FRANSEN CLEGG, Deceased.
CARL O. FRANSEN et al., Contestants and Respondents, v.
DAN WIEBE, as Executor, etc., Claimant and Appellant.

596

**COUNSEL**

Nakashima & Boynton and S. Stephen Nakashima for Claimant and Appellant.

Wool, Richardson & Graff and William E. Gitt for Contestants and Respondents.

**OPINION**

**TAYLOR, P. J.**—Dan Wiebe, the executor, appeals from a judgment entered on a special verdict revoking probate of the purported June 11, 1975, will of Anna D. Clegg on the petition of her surviving heirs at law.[1] He contends that there was insufficient substantial evidence to support

[1]The three petitioners, who lived in Minnesota, were the surviving brothers and younger sister of the deceased at the time of the filing of their petition on July 9, 1976. Albert died in January 1977, prior to the instant trial.

the verdict and judgment as to lack of sufficient testamentary capàcity and undue influence of Lincoln Glen Manor for Senior Citizens. For the reasons set forth below, we have concluded that the judgment must be affirmed.

Viewing the record in favor of the verdict and judgment, the following pertinent facts appear: Anna Clegg was born on September 19, 1892, in Minnesota. She moved to California in 1921 and to Lincoln Glen Manor for Senior Citizens (Lincoln Glen Manor) in July or August 1973. She died on February 15, 1976, and left an estate valued at $72,800.

Prior to entering Lincoln Glen Manor, Mrs. Clegg visited Dr. Buford Wardrip on July 18, 1973, for a physical examination. During that initial examination, Dr. Wardrip determined that Mrs. Clegg was suffering from arteriosclerosis, which has the effect of slowing all the processes of the body. Dr. Wardrip also examined Mrs. Clegg in January 1974, and on June 2, 1975. Dr. Wardrip's notes from the June 2, 1975, examination revealed that Mrs. Clegg had been feeling less well than usual for the previous two months, and that she had fallen backwards on one occasion due to dizziness. Dr. Wardrip diagnosed that Mrs. Clegg had failed markedly, both physically and mentally, between January 1974 and June 2, 1975.

Dr. Wardrip next examined Mrs. Clegg on June 10, 1975, the day before she executed the purported will here in issue. On that date, he determined that Mrs. Clegg was "very weak," and that her mentation was "poor." Dr. Wardrip further diagnosed that Mrs. Clegg was suffering from a form of senile dementia, and that her mental capacity was reduced. As a result of his examination, Dr. Wardrip advised Wiebe, administrator of the Lincoln Glen Manor, that other living arrangements should be made for Mrs. Clegg. Consequently, Mr. Wiebe made arrangements to have Mrs. Clegg admitted to Bethany Convalescent Hospital (Bethany). Bethany, however, required that a patient had to be admitted by a responsible person, a relative or a guardian. Mr. Wiebe concluded that a conservatorship would best meet Mrs. Clegg's needs.

On June 11, 1975, Mr. Wiebe and his secretary, Lorraine Franz, advised Mrs. Clegg that Dr. Wardrip had recommended that she be admitted to a convalescent hospital. Mr. Wiebe asked Mrs. Clegg "if she wanted us to call an attorney to take care of the legal documents." Mrs. Clegg answered affirmatively. Mr. Wiebe then called S. Stephen Nakashima who was his personal attorney, as well as the attorney for Lincoln

Glen Manor. Mr. Wiebe, Ms. Franz, Mr. Nakashima and his secretary, Phyllis Horrobin, proceeded to Mrs. Clegg's room where Mr. Nakashima suggested a conservatorship for Mrs. Clegg. Mrs. Clegg requested that Mr. Wiebe and Ms. Franz be appointed as her conservators.

Ms. Horrobin, Ms. Franz and Mr. Wiebe then left Mrs. Clegg's room so that Ms. Horrobin could type the nomination of conservators. While the others were absent, Mr. Nakashima asked Mrs. Clegg if she had a will. Although she had a will dated 1955, Mrs. Clegg responded in the negative. Despite Mrs. Clegg's statement that she had relatives, Mr. Nakashima explained the concept of escheat[2] to her and informed her that she should have a will.

Mr. Nakashima then asked Mrs. Clegg to identify the beneficiaries of her property. Mrs. Clegg responded that the people at Lincoln Glen Manor "had been real nice to her." Mr. Nakashima inquired whether Mrs. Clegg wanted to leave her property to Lincoln Glen Manor and Mrs. Clegg answered affirmatively. Mr. Nakashima also suggested that Mr. Wiebe be named as executor. The purported will naming Lincoln Glen Manor as sole beneficiary was typed by Ms. Horrobin, who served as a witness, along with Mr. Nakashima. Mrs. Clegg executed both the nomination of conservators and the purported will. The entire series of events lasted about one hour.

On June 12, 1975, Mrs. Clegg was admitted to Bethany. On the same day, Dr. Wardrip noted that Mrs. Clegg was suffering from severe congestive failure, that she had cerebrovascular insufficiency, and is "forgetful and unable to take care of herself." The nurse's notes from Bethany contain several references to Mrs. Clegg's "confusion" and "lack of orientation."

During Mrs. Clegg's stay in Bethany, her long-time acquaintance, Margaret Ball, wrote several letters to Mrs. Clegg's brothers and sister. In a letter addressed to Mrs. Clegg's brother Carl and his wife, Ms. Ball noted that Mrs. Clegg had fallen "and hit her head on the pavement." Ms. Ball opined that after this accident, Mrs. Clegg's mind began to fail "and that she was in such a state that she was unable to look after herself and hardly knew what was going on." Ms. Ball further testified that Mrs. Clegg had not changed mentally during the last year of her life. Ms.

---

[2]In certain circumstances, not present here, a decedent's property will escheat to the State of California (Prob. Code, § 231).

Franz testified that on June 27, 1975, she discovered $9,000 cash in Mrs. Clegg's room.

Mrs. Clegg's brothers and sister were never advised or notified that Mr. Wiebe and Ms. Franz had been appointed conservators for Mrs. Clegg. Although Mrs. Clegg's relatives were informed of her death, they received no notice of the petition for probate of the purported will executed on June 11, 1975. That petition, executed by Mr. Wiebe on February 26, 1976, declared under penalty of perjury: "No brother or sister or issue of a predeceased brother or sister," although Mr. Wiebe was aware that Mrs. Clegg's brothers and sister were alive. Uncontroverted evidence indicated that Mrs. Clegg's brothers and sister had corresponded with Mrs. Clegg at Lincoln Glen Manor, and with Lincoln Glen Manor after some of their letters remained unanswered.

■ The established rule of appellate review is that the holding of the trial court cannot be disturbed on appeal if there is *any* substantial evidence to support it (*Nestle* v. *City of Santa Monica,* 6 Cal.3d 920 [101 Cal.Rptr. 568, 496 P.2d 480]). In addition, "all conflicts [in the evidence at trial] must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible" (*Crawford* v. *Southern Pacific Co.,* 3 Cal.2d 427, 429 [45 P.2d 183]). ■ As indicated above, the jury here found that Mrs. Clegg lacked testamentary capacity and had been subject to the undue influence of Lincoln Glen Manor at the time she executed the purported will of June 11, 1975. The test of competency is whether Mrs. Clegg had sufficient mental capacity to: 1) understand the nature of her act; 2) understand and recollect the nature and situation of her property; and 3) remember and understand her relations to the persons who have claims upon her bounty, and whose interests are affected by the will (*Estate of Fritschi,* 60 Cal.2d 367, 372 [33 Cal.Rptr. 264, 384 P.2d 656]).

■ Although the determinative fact is Mrs. Clegg's mental condition at the time of the execution of the purported will, evidence of testamentary incompetency at other times can establish testamentary incompetency at the time of execution (*Estate of Callahan,* 67 Cal.2d 609 [63 Cal.Rptr. 277, 432 P.2d 965]; *Estate of Fosselman,* 48 Cal.2d 179 [308 P.2d 336]). " '. . . Once it is shown that testamentary incompetency exists and that it is caused by a mental disorder of a general and continuous nature, the inference is reasonable [citations], perhaps there is even a legal presumption [citations] that the incompetency continues to exist. . .' " (*Estate of Callahan, supra,* p. 616). ■ Such an inference is

particularly strong in a case such as the instant one. According to her physician,[3] Mrs. Clegg suffered from senile dementia, a mental disorder that becomes progressively worse, and arteriosclerosis prior to her execution of the purported will. Dr. Wardrip further opined that he doubted that: 1) she knew and understood the nature of the making of the will; 2) she was able to understand the nature and extent of her property; and 3) she remembered her living relatives.

In addition, the letter written to Mrs. Clegg's brother Carl and sister-in-law Olga by Margaret Ball, a long-time acquaintance[4] of Mrs. Clegg, indicated that after suffering a blow to the head in 1974, Mrs. Clegg's mind began to fail, that she was unable to look after herself and that she hardly knew what was going on. Further, Dr. Wardrip opined that on June 12, 1975, Mrs. Clegg suffered from cerebrovascular insufficiency and was forgetful and unable to take care of herself. The nurse's notes from Bethany confirmed his observation that Mrs. Clegg was confused and lacked orientation on June 12, 1975. Mr. Nakashima admitted on cross-examination that he never discussed with Anna Clegg the nature and extent of her property.

The aforementioned evidence establishes that Mrs. Clegg lacked testamentary capacity prior to and after execution of the will. Her mental disorder, therefore, was of a general and continuous nature. Consequently, it may be inferred that Mrs. Clegg lacked testamentary capacity on June 11, 1975, the date of execution of the purported will. Thus, the jury's finding that Mrs. Clegg lacked testamentary capacity was amply supported by substantial evidence.

█ Since the evidence here supports the finding that Mrs. Clegg was mentally incompetent to make a will, it is not necessary on this appeal to consider in great detail the sufficiency of the evidence to sustain a finding on the issue of undue influence (*Estate of Baker,* 176 Cal. 430 [168 P. 881]). However, given the record, we feel constrained to do so briefly.

We have already indicated that Mr. Wiebe was the administrator of Lincoln Glen Manor and served on its board of directors from 1965 to October 1, 1975. Mr. Wiebe, Ms. Franz and Mr. Nakashima were

---

[3]Opinion testimony of a witness testifying as an expert is admissible (Evid. Code, § 801). The testimony of a single witness will suffice (*Menning* v. *Sourisseau,* 128 Cal.App. 635, 639 [18 P.2d 77]).

[4]Opinion evidence on the issue of mental capacity may be given by an intimate acquaintance (Evid. Code, § 870).

members of the Lincoln Glen Church, Mennonite Brethren, the religious organization that sponsors Lincoln Glen Manor. Mr. Nakashima was raised, from a religious standpoint, by the Mennonite Church, and was "paying them back" by performing legal services for the church. Mr. Nakashima was Mr. Wiebe's personal legal representative and also the lawyer for Lincoln Glen Manor. It, therefore, cannot be questioned that Mr. Wiebe, Mr. Nakashima and Ms. Franz were representatives of Lincoln Glen Manor.

■ In this state, a presumption of undue influence arises when there is a concurrence of the following elements: 1) the existence of a confidential or fiduciary relationship between the testator and the person alleged to have exerted the undue influence; 2) active participation by such a person in preparation or execution of the will; and 3) an undue benefit to such person or another person under the will thus procured (*Estate of Fritschi, supra,* 60 Cal.2d, p. 376; *Estate of Gelonese,* 36 Cal.App.3d 854, p. 861 [111 Cal.Rptr. 833]). When a will contestant has shown by a preponderance of evidence that the above elements are present, the burden then shifts to the proponent to prove that the will was not induced by his undue influence (*Estate of Gelonese, supra,* p. 863). The question of whether or not this burden was met was for the jury.

■ As to the existence of a fiduciary or confidential relationship, Mr. Wiebe, as administrator of Lincoln Glen Manor, and his secretary, Ms. Franz, were in a confidential relationship with Mrs. Clegg as they had been nominated as her conservators prior to the execution of the purported will.

■ As to whether the proponents, or any of them, actively participated in the preparation of the purported will, we note that such activity may be established by inference, that is, by circumstantial evidence (*Estate of Garibaldi,* 57 Cal.2d 108, 113 [17 Cal.Rptr. 623, 367 P.2d 39]). ■ Here, the uncontroverted evidence indicated that it was at the suggestion of Mr. Wiebe that Mr. Nakashima, his personal attorney, as well as the attorney for Lincoln Glen Manor, was called "to take care of the legal documents" for Mrs. Clegg. Although under the circumstances Mrs. Clegg's property could not have escheated to the State of California (fn. 2 at p. 599 above), Mr. Nakashima explained the concept of escheat to Mrs. Clegg and informed her that she should have a will. Mr. Nakashima then suggested that Mrs. Clegg leave her property to Lincoln Glen Manor.

█ The relationship of an attorney to his client is both fiduciary and confidential. Hence, when an attorney, by advice or action, takes part in the preparation or execution of a will, the presumption of undue influence arising from the confidential or fiduciary relationship is applicable where the will benefits the attorney (*Estate of Lances,* 216 Cal. 397 [14 P.2d 768]). To rebut the presumption, the attorney must, by clear and satisfactory evidence, prove that he took no unfair advantage and that he reminded her of the natural objects of her bounty (*Estate of Corbett,* 123 Cal.App.2d 465 [266 P.2d 935]). █ Here, despite Mrs. Clegg's statement that she had relatives, Mr. Nakashima talked to her about escheat.

As to the third element of undue benefit to Lincoln Glen Manor, there can be no question. Although Mrs. Clegg had living relatives, Lincoln Glen Manor was the sole beneficiary of the purported will. Her relatives were not informed about either the conservatorship or the attempted probate of the document of June 11, 1975; Mr. Wiebe's petition expressly alleged, under penalty of perjury, that there were no brothers or sisters. We can only conclude that there was also ample substantial evidence to support the finding of undue influence.

The judgment is affirmed.

Kane, J., and Rouse, J., concurred.